LEMMON, Judge.
In this tort action plaintiff, who was injured when he fell through a hole in a scaffold while working on a building construction site for B. E. King & Sons, Inc., a plastering sub-contractor, sought to recover damages against defendant B & R Masonry Company, Inc., the masonry sub-contractor who owned the scaffold. Plaintiffs suit was dismissed after a trial on the merits on the basis that “plaintiff has failed to prove, by any preponderance of evidence, that any board was removed by any agent or employee of B & R Masonry . . . .” The principal issue on appeal is the sufficiency of plaintiffs proof on this point.
I
At the time of the accident work was in progress topping off the wall of a 35-foot high building.
In the subcontracting schedule of this particular phase of construction the bricklayers completed the concrete block wall; then the carpenters attached wood strips to the masonry; then the lathers nailed laths (sheets of wire mesh) to the wood strips; and finally the plasters completed the exterior finish. King, whose plastering subcontract included the lathing work, had used a power-operated “swinging stage” scaffold for earlier work on this job. However, on the day plaintiff was injured, he was working with express or implied permission on B & R’s scaffold, which was designed for masonry work.[1]
The two-level masonry scaffold consisted of a series of upright metal towers, eight feet apart, with scaffold boards (2 x 10-inch planks) laid horizontally across the tower’s crossarms. The lower level, two boards wide and adjacent to the building, was the level where the bricklayers worked. The upper level, seven boards wide and 20 inches higher, served two functions. Masonry mix and blocks were placed on the inner side of the upper level, within reach of the bricklayers, while hod carriers (masonry laborers) used the outer side of the upper level to transport additional materials by wheelbarrow.
Most of the scaffold boards were 16 feet long, but between the points where towers extended through the scaffold’s upper level, there were shorter scaffold boards {Th feet long) specially cut to fit between the towers.[2] The hole through which plaintiff fell was between two towers, where one of the short scaffold boards was missing.[3]
When the lathing crew used the masonry scaffold, the lathers worked from the upper level (on the third row of boards), moving from left to right while nailing the 27-inch wide laths to the wood strips. As plaintiff moved in this fashion facing the wall, and because the tower protruding several feet into the air obstructed his view of the hole as he moved to his right, plaintiff never saw the hole until he fell through it as he turned and stepped to reach for materials, which were lying on the scaffold boards behind him and to his left.
*94 II
Nothing in the record even suggests any inherent defect in the scaffold. Thus, plaintiff’s case in negligence is based on a hazard created by the removal of one or several boards.[4] Since the owner of the scaffold with no inherent defects ordinarily would not be deemed negligent when a hazard is created by removal of a board by a third person without the owner’s knowledge, plaintiff’s claim against B & R based on negligence depends upon proof that B & R’s employee or agent removed the board or that some other related act or omission by B & R contributed in some manner to causation of the accident.
III
Plaintiff attempted, by use of both direct and circumstantial evidence, to prove that one of B & R’s employees removed the board in the area through which plaintiff fell.
The direct evidence was the deposition testimony of B & R’s former bricklayer foreman, Merle Hancock, who stated that a B & R labor foreman, Joe Gaines, said after the accident that he (Gaines) had “taken a plank from there to use on another scaffold”.[5] At trial Gaines denied removing a board from the scaffold and denied telling Hancock he had removed a board. Thus, there was a conflict in the testimony as to whether Gaines removed the board, and while an admission by an employee of the defendant is strong evidence against the defendant, we would not reverse on the sole basis of this disputed admission.
However, the circumstantial evidence strongly indicates that a B & R employee removed the board.
B & R’s work had progressed from left to right along the outer wall of the building, and as B & R and the carpenters (employees of the general contractor who customarily used B & R’s scaffold on that job) completed their work in a given area, B & R’s laborers dismantled the scaffold on the left end and added on to the scaffold at the right end, where work was yet to be done.
It is undisputed that in the pertinent area of time B & R’s employees were dismantling the section of scaffold at the left end. The carpenters finished their work on the scaffold on the day before the accident. Moreover, B & R’s president admitted “(o)ne of the scaffold we were in the process of stripping off”. And King’s lather foreman testified without contradiction that on the afternoon before the accident he and plaintiff had walked the entire length of the scaffold, marking off the places for expansion joints, and had seen several boards missing but only at the left end of the scaffold where B & R’s men were moving boards to set up the scaffold at the other end.
Since B & R was dismantling the scaffold on the day before the accident, the most reasonable inference is that B & R’s employees removed the several boards missing from the scaffold. Except for the carpenters, only King and B & R had employees (King had three or four, and B & R had 20) on the scaffold in that area of time, and the carpenters had completed their work in the area on the day before the accident. King’s employees had no reason to remove scaffold boards, since they were using the scaffold which had been set up earlier to accommodate B & R’s employees and the carpenters. On the other hand, B & R’s employees at the time were in fact dismantling one end of the scaffold and adding on to the other end in order to perform bricklaying work there. There was also other testimony that B & R had scaffold towers at another point on the construction job.[6]
*95 The only suggestion that the board was removed for some other reason was testimony by a B & R laborer that on the morning of the accident he saw three men on the scaffold take a board out of the scaffold in order to pull laths through with a rope and hook. He stated he watched this for over two hours before the accident, but didn’t see any men on the ground (where the witness was) hooking up the materials, and that the men on the scaffold on about four occasions during that period pulled up three or four pieces at a time through the same hole.
The laborer’s testimony was contradicted by all King employees, who testified that laborers hoisted the materials by pulley or by use of the swinging stage onto the roof in large bundles before the lathers began hanging the laths, and that the materials were later handed off the roof, several pieces at a time, to lathers on the scaffold who stacked them at various points along the wall before starting to hang them. Logical analysis also contradicts that testimony, since it is highly improbable that materials would be hoisted (by higher paid lathers rather than laborers) in small bunches through the same hole over a period of more than two hours, when the lather is moving quickly, hanging 27-inch wide sheets by tacking with three nails. (In the process a second lather follows, completing the nailing down of the laths.) Moreover, if it were necessary to obtain laths in small numbers from the ground, it would have been a great deal simpler to hoist the materials over the back end of the scaffold (which was protected by a hand rail and not a fence) rather than creating a seven-foot opening through which to pull the eight-foot long laths.
Finally, B & R’s president checked the scaffold immediately after the accident and observed the hole created by removal of the board but did not report seeing the missing board in the area. And a B & R foreman testified that he saw King’s employees covering the hole with plywood after the accident, further indicating that the missing board had not simply been temporarily removed and placed on the side. Indeed, the board, if removed for any reason suggested except for use on another scaffold, would still have been near the opening.
Proof by direct or circumstantial evidence is sufficient to constitute a preponderance when the evidence taken as a whole shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972). The plaintiff has successfully borne his burden when the evidence indicates that the defendant’s negligence was the most probable cause of the casualty and that no other factor can as reasonably be ascribed as the cause. Hanover Ins. Co. v. Jacobson-Young, Inc., 294 So.2d 564 (La.App. 4th Cir.1974). From the circumstantial evidence in this case, considered with Hancock’s testimony that Gaines admitted removing the board, we conclude that B & R was negligent in partially dismantling a scaffold that was being used by another trade firm under a rental agreement or with B & R’s permission.[7]
IV
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, the standard being that of a reasonable man under like circumstances. Smolinski v. Taulli, 276 So.2d 286 (La.1973). The issue here is. whether plaintiff’s failure to see the hole constituted substandard conduct under the circumstanc.es,.... „ ...•,
*96 Plaintiff had walked the length of the scaffold several times the day before, and boards were missing only at the left end. As he worked on the morning of the accident, he was facing the wall, moving from left to right on the third row of boards. As he approached the hole, the 12-inch wide upright tower, extending several feet above the scaffold floor, reasonably interfered with his view of the hole. He passed the upright tower while facing the wall, and when he turned to pick up another lath from the pile of materials to his left, he had no reason to anticipate a missing board, and he stepped onto the place where the board should have been.
Defendants argue that plaintiff could easily have seen that the board was missing. This argument, while based on an obvious fact, has no legal significance. The determinative issue is not what plaintiff could have seen, but what he should have seen in the exercise of reasonable care, and this basically involves the duty to discover.
Under the circumstances of this case plaintiff had no duty to check for missing scaffold boards before each step that he took, as he had no reason to anticipate that someone would remove a board and create a trap for those working on the scaffold (either as lessee or permittee). In exercising reasonable care for his own safety, he had no duty to discover this trap which was partially hidden and completely unexpected.
We hold that plaintiff was not contribu-torily negligent in failing to anticipate that someone would create a trap and submit him to an unreasonable risk of injury. Compare Canter v. Koehring Co., 283 So.2d 716 (La.1973).
V
In the October 19, 1971 accident plaintiff sustained a displaced fracture of the left wrist, an open fracture of the left tibia and fibula, a depressed fracture of the skull, a brain contusion, a fractured pelvis and a severe fracture of the cheekbone. He underwent surgical removal of the skull-bone particle and suturing of the brain covering, as well as reduction of the fractures of the extremities and, eventually, reduction of the cheekbone fracture and plastic surgery. He recovered progressively in the hospital and was transferred on November 5, 1971 to a rehabilitation center.
In June, 1972 he entered the Veterans Administration Hospital after exhibiting strange behavior, confusion and memory loss. The doctors diagnosed cortical damage, secondary to the skull fracture, and organic brain syndrome as the cause of his rage reaction, personality change and loss of memory.[8] He was administered thora-zine and hospitalized for two months, after which he was discharged to outpatient status on thorazine and declared not then suitable for employment.
Plaintiff continued under the care of a psychiatrist, and at time of trial his psychiatric problems appeared to be controlled by medication. He also had a slight limp attributable to the leg injury. However, he had not returned to gainful employment at the time of trial in December, 1974.
At the time of the accident plaintiff was a 30-year old skilled worker who had earned $8,780.05 during 1971 before the October accident. While the psychiatrist testified that it would be dangerous for plaintiff to work on scaffolds while on the essential medication, there was no evidence that he could not work at other types of employment.
Plaintiff suffered a severe injury which has permanently affected his life and outlook, his family relationships and his earning capacity. While the evidence is skimpy as to the extent of permanent disability and the degree of impairment of earning capacity, the record justifies a total, award of at least $100,000.00.[9]
*97 For these reasons the judgment of the trial court is reversed, and it is now ordered that there be judgment in favor of plaintiff and against defendants in the sum of $100,-000.00, plus legal interest from the date of judicial demand and all costs in both courts.

REVERSED AND RENDERED.

.In a sub-issue, in which B & R and King each attempted to disclaim responsibility for the scaffold on .the date of the accident, B & R's president testified that he rented the scaffold to King and sent King an invoice for rental for six days, beginning the day before plaintiffs accident. Although King’s president denied renting the scaffold, he admitted payment of the invoice for that period.

. The two rows of boards closest to the building formed the lower level. The third row of ..boards was the first , row on the upper, level. The fourth row of boards included the short boards, because the support towers extended through at this point.

. All witnesses agreed that immediately after the fall there was a missing short scaffold board directly above the point where plaintiff hit the ground.

. B & R’s president checked the scaffold immediately after the accident and found three or four short boards missing on either side of the place through which plaintiff fell.

. The discovery deposition, taken while Hancock still worked for B & R, was introduced at trial because Hancock was living out of state at time of trial.

.Gaines testified B & R had about 30 scaffold towers on the job (the rental invoice to King was for 14) and “didn’t have them all in the same spot".

. B & R’s president testified that King had earlier been refused use of the scaffold, and there was no evidence of a communication to B & R’s employees that King would begin using the scaffold on the day before the accident. Therefore, it is logical that, once the masonry workers and carpenters had completed their work in the area, B & R’s employees (unless instructed to the contrary) would follow their usual procedure and dismantle and reassemble the scaffold without concern for safety of workers in the area, since no one else would be expected to work there.

. At trial the neurosurgeon who treated plaintiff for two months after the accident stated that a brain contusion in that area can cause loss of emotional control, rage reaction and loss of memory.

. Medical expenses and compensation benefits paid by the workmen’s compensation insurer were demanded in a consolidated suit, but the judgment dismissing that suit was not appealed.