CHARLES R. JONES, Chief Judge.
|/The Appellants, Parish Anesthesia Associates, Ltd., and Dr. Jayachandra Indu-ra, seek review of the judgment of the district court holding that the Appellants were liable to the Appellee, Arnold Richard, for medical malpractice. Finding that the district court did not err, we affirm the judgment of the district court.
Mr. Richard is a chronic pain patient who was implanted with a Codman 3000 infusion pump (“Codman pump”), which is an intrathecal pump used to deliver a dosage of pain medications directly to the spinal fluid. Mr. Richard received a medication solution comprised of morphine, ba-clofen, and clonidine in monthly pump refills, which were routinely injected into a reserve chamber of the Codman pump and gradually released into his spinal canal over the course of a month.
In February 2006, Mr. Richard presented to East Jefferson General Hospital (“EJGH”) for his monthly Codman pump refill. Dr. Jayachandra Indura, an employee of Parish Anesthesia Associates, Ltd., was the attending anesthesiologist who performed the refill procedure for Mr. Richard. No one witnessed the refill | ¡.procedure performed by Dr. Indura. Within minutes of receiving his pump refill, Mr. Richard lost consciousness and became unresponsive. Mr. Richard was returned to the procedure room where Dr. Indura aspirated approximately 18.5 ml of fluid from Mr. Richard’s pump. Thereafter, Mr. Richard was rushed to the emergency room of EJGH, and later remained in the intensive care unit until he was discharged from the hospital on February 8, 2006. It is uncontested that Mr. Richard suffered from an overdose as a result of the refill procedure.
A week after his discharge, Mr. Richard was treated at St. Tammany Hospital for dehydration, as well as other complications. Subsequently, in June 2006, Mr. Richard again sought treatment at St. Tammany Hospital after having a seizure at home.
Mr. Richard filed suit against the Appellants in May 2008, alleging that Dr. Indura caused the overdose by negligently refilling the Codman pump, he breached the acceptable standard of care owed to Mr. Richard, and caused the overdose. He further alleged that Dr. Induru’s employer, Parish Anesthesia Associates, Ltd., was jointly, severally, solidarity, and vicariously liable for the actions of Dr. Indura. Trial was held in October 2011, and the district court later rendered judgment in favor of Mr. Richard against the Appellants in the amount of $350,000 in damages resulting from the negligent administration of a morphine/baelofen/clonidine solution in addition to $98,826.75 for medical expenses.
The district court explained that “for the following reasons this court finds that physician error was the cause of the overdose” of Mr. Richard:
By defendant’s (Dr. Induru’s) testimony, the refill kit contained one needle called a non-coring needle which, when inserted into the implanted pump, would
*733 contact a plate at the bottom of the apparatus, thereby allowing for the solution to flow into the underlying | .¡reservoir. Use of this non-coring needle prevents any fluid from entering into the bolus path — that is, the path that leads directly into the spinal canal.
According to defendant, the refill kit excludes a needle known as a bolus needle. Rather, defendant asserts that the needle must be specially ordered. Contrastingly, Dr. Paul Hubbell, III, testified that this needle is included in the kit. Either way, this instrument is used only when the physician seeks to inject medication directly into the spinal canal.
Defendant also testified as follows: On the day of the refill, defendant opened the kit, sterilized and draped the area. He then began the procedure, inserting the non-coring needle and removing approximately 1.5 ml of residual fluid still in the pump. At that time, the pump was working properly. He then injected 18 ml of solution into the reservoir. After plaintiff lost consciousness and was taken to the emergency room, defendant aspirated 18 ml of the solution from the pump; apparently, he removed all that he injected. The extracted fluid was then discarded without any testing to determine the nature of its composition, whether the extract was solely comprised of the morphine/baclofen/clo-nidine solution or a combination of this cocktail and spinal fluid. At no point after the plaintiff lost consciousness did the defendant chart in the plaintiffs medical records that he experienced a pump malfunction.
The defendant’s account fails to satisfy this Court. Defendant proposes that he aspirated the morphine/baclofen/clo-nidine solution in its entirety. However, this theory falls short of satisfactorily explaining how the defendant was able to aspirate 18 ml of the morphine/baclo-fen/clonidine solution fi'om the pump and the plaintiff overdose on the same only moments after receiving his injection. Further, no evidence produced at trial indicated that the pump malfunctioned. Indeed, Dr. Hubbell testified that had the refill been properly performed plaintiff would not have overdosed. Thus, for these reasons, this court therefore finds that physician error caused plaintiffs overdose.
Subsequently, the parties filed a joint motion for new trial seeking to amend the judgment to limit the liability of the Appellants to the amount of $100,000 by 14virtue of their Patients Compensation Fund qualification. The district court granted the motion and rendered an amended judgment in December 2011, wherein the court ordered:
1. that the Appellants pay $100,000 in damages to Mr. Richard for negligent administration of a morphine/baclo-fen/clonidine solution;
2. awarded Mr. Richard $250,000 plus $98,826.75 from the Louisiana Patient’s Compensation Fund for medical expenses;
3. that the Appellants and the Louisiana Patient’s Compensation Fund pay Mr. Richard judicial interest as statutorily provided; and
4. that applicable court costs shall be awarded under La. C.C.P. art. 1920 at the time of the hearing upon an appropriate rule to show cause.
This timely appeal followed, and the Appellants raise four (4) assignments of error:
1. The district court committed legal error when it placed the burden of proof on the Appellants;
2. The district court committed legal error by finding negligence on the part of the Appellants based on circumstan *734 tial evidence alone even though Mr. Richard’s injury was of a kind which can occur in the absence of negligence in contradiction to the Supreme Court’s holding in Cangolosi [Cangelosi ] v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989);
8. The district court erred in finding that physical error was the most likely cause of Mr. Richard’s injuries, as illustrated by numerous statements in the Reasons for Judgment which are in direct contradiction to the record; and 4. The district court clearly erred in finding that Mr. Richard satisfied his burden of proving that the overdose was the cause of any alleged deterioration in his quality of life.
LThe manifest error rule applies in appeals of medical malpractice actions. Stamps v. Dunham, 07-0095, p. 4 (La.App. 4 Cir. 9/19/07), 968 So.2d 739, 743. “Malpractice claims are subject to the general rules of proof applicable to any negligence action: the plaintiff must prove a standard of care, a breach of that standard, causation, and damages.” Id. Furthermore, “[w]hether alleged malpractice constitutes negligence is a question for the jury.” Braud v. Woodland Vill. L.L.C., 10-0137, p. 7 (La.App. 4 Cir. 12/8/10), 54 So.3d 745, 750 [Citations omitted]. The Louisiana Supreme Court has provided a two-prong test for the reversal of a fact-finder’s determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is manifestly erroneous. Id, p. 7, 54 So.3d at 750-51 (citing Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993), and Mart v. Hill, 505 So.2d 1120, 1127 (La.1987)).
In their first assignment of error, the Appellants argue that the district court committed reversible error because it found negligence on the part of Dr. Induru as a result of his inability to prove an alternative cause of Mr. Richard’s injuries. The Appellants argue that, the district court misapplied the burden of proof by placing the burden on Dr. Induru, and, thus, the district court committed reversible error. The burden of proof of causation rests with the plaintiff. Parker v. State Farm Fire & Casualty Co., 348 So.2d 91, 95 (La.App. 4 Cir.1977). The Appellants further argue that Mr. Richard bore the burden of proving that Dr. Indu-ru committed some | fiact of malpractice and that pursuant to La. R.S. 9:2794(C)[1], Mr. Richard cannot rely on his injury, the overdose, as proof itself that malpractice occurred.
The Appellants argue that the more likely explanation for Mr. Richard’s overdose was that his Codman pump malfunctioned. They further argue that it was not their burden to establish that the Codman pump malfunctioned because Mr. Richard, as the plaintiff, carried the burden of proof of proving that Dr. Induru’s alleged negligence was the most probable cause of the *735 malpractice and no other factor can be reasonably ascribed as the cause under Parker.
The Appellants further argue that the district court erroneously did not consider whether Mr. Richard presented any evidence of Dr. Induru committing an act of negligence.
Mr. Richard argues that the district court applied the correct burden of proof, which he met at trial. Mr. Richard further argues that he is not required to negate the possibility of the malfunction of the Codman pump because statutorily a plaintiff need only prove that the medical provider breached the standard of care. La. R.S. 9:2794(a). He argues that all of the medical experts that testified agreed that he suffered an overdose, which evidences a breach of the standard of care. As a result of the overdose, Mr. Richard argues that he suffered respiratory failure; 17convulsions; malignant hypothermia; hallucinations; drug withdrawal; acidosis; adverse effect of opiates; hypertension; hypotension; seizures; loss of brain cells; and now suffers with early dementia.
Mr. Richard further argues that because Dr. Induru contends that the Codman pump at issue was defective, Dr. Induru must establish by a preponderance of the evidence that the Codman pump malfunctioned when Dr. Induru refilled the Cod-man pump. Dr. Induru could not meet this burden. Moreover, the record indicates that the Codman pump was not defective because a dye test conducted on the Codman pump at issue a month before the overdose revealed that the Codman pump was working properly.
Our Court has held that medical malpractice claims are subject to the general rules of proof applicable to any negligence action; the plaintiff must prove a standard of care, a breach of that standard, causation, and damages. Stamps v. Dunham, 07-0095, p. 4 (La.App. 4 Cir. 9/19/07), 968 So.2d 739, 743. Additionally, the Louisiana Supreme Court in Pfiffner v. Correa, 94-0992 (La.10/17/94), 643 So.2d 1228, 1232-33, summarized the statutory burden upon plaintiffs in medical malpractice cases:
... the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.
“Our review of Louisiana jurisprudence indicates that both the Louisiana Supreme Court and every circuit appellate court in this state has implicitly recognized third-party fault as an affirmative defense.” Bienvenu v. Allstate Ins. Co., 01-2248, p. 5 (La.App. 4 Cir. 5/8/02), 819 So.2d 1077, 1080; La. C.C.P. art. 1005. The party pleading an affirmative defense has the burden of proving it by a [¿preponderance of the evidence. Allvend, Inc. v. Payphone Commissions Co., Inc., 00-0661, p. 6 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 30.
In this instant matter, the record does not indicate that the district court incorrectly applied the burden of proof. The district court was presented with conflicting testimony as to whether Mr. Richard’s overdose was caused by physician error or a malfunction of the Codman pump. Mr. Richard carried his requisite burden of proof and established through the testimony of doctors Edson Parker, Paul Hubbell, and Chad Domangue, that Dr. Induru incorrectly performed the pump refill and that this was a deviation of the standard of care owed.[2]
*736 Dr. Domangue testified that he treated Mr. Richard in February 2009, for memory loss and personality changes. Dr. Do-mangue further testified that he conducted a mini-mental status exam of Mr. Richard, who scored a 28/30. Dr. Domangue testified that the two point loss was related to short-term memory loss by Mr. Richard. Dr. Domangue further testified that memory loss is essentially irreversible, and that Mr. Richard more probably than not is at risk for early onset dementia.
Dr. Domangue further testified that any of the medications that were injected into the Codman pump could have caused Mr. Richard’s blood pressure to drop. He testified that he believed that the entire 18 ml was injected into Mr. Richard’s cerebral spinal fluid and the medicine was a bolus. He further testified that the first time that Mr. Richard treated at St. Tammany Hospital was a week after the overdose, and Mr. Richard presented for treatment with the following health | conditions: difficulty speaking, facial droop, and a clot in a major vein of his brain, venous thrombosis. Dr. Domangue further testified that with regard to the second visit of Mr. Richard to St. Tammy Hospital, in June 2006, Mr. Richard was admitted for episodes of altered consciousness, fluttering movements, and potential seizures. Dr. Domangue opined that the visit was also related to the February 2006 overdose.
Dr. Domangue further testified that when Mr. Richard was released from EJGH following the overdose he was not released in a normal state, because his “venous thrombosis was a direct correlation to his dehydration.” Mr. Richard was unable to eat, was running a fever of 103, and never returned to baseline. Thus, Dr. Domangue testified that Mr. Richard’s admission to St. Tammany Hospital a week after the overdose was related to dehydration and the refill procedure.
Dr. Edson Parker testified by video deposition on behalf of Mr. Richard. Dr. Parker testified that the 18 ml solution injected by Dr. Indura into the intrathecal space of Mr. Richard caused the life-threatening signs and symptoms he experienced almost immediately after the injection. Dr. Parker testified that Mr. Richard experienced these signs and symptoms immediately due to a baclofen overdose in the intrathecal space. Dr. Parker further testified that the incorrectly placed injection by Dr. Indura is below the standard of acceptable medical care.
However, as stated above, the Appellants had to establish by a preponderance of the evidence that there was third party fault or a Codman pump malfunction. We note that Dr. Indura’s own expert, Dr. Joseph Turnipseed, testified that he (Dr. Turnipseed) stood by the results of the medical review panel, of which Dr. Turnip-seed was a member, finding that the overdose of Mr. Richard could have been caused by physician error. Furthermore, expert testimony revealed | inthat Mr. Richard suffered from an overdose of medication which was a direct result of the refill procedure.
Lastly, the record reveals that a month prior to the overdose of Mr. Richard, his Codman pump was dye-tested to reveal whether it was malfunctioning and the Codman pump showed no sign of malfunctioning. Thus, the district court had more than one basis in the record for excluding a malfunction of the Codman pump as the cause of Mr. Richard’s overdose. We find *737 that this assignment of error is without merit.
In their second assignment of error, the Appellants argue, in the alternative to their first assignment of error, that the district court erred when it inferred negligence on the part of Dr. Indura. As previously mentioned, the Appellants argue that Mr. Richard presented no direct evidence of Dr. Indura’s act of negligence. Thus, they argue that the district court inferred negligence on the part of Dr. In-dura based solely on circumstantial evidence, although the injuries sustained by Mr. Richard could have occurred in the absence of negligence if the Codman pump had malfunctioned. No witnesses were called to testify that they observed Dr. Indura commit malpractice.
The Appellants argue that the Louisiana Supreme Court has held that when a plaintiff attempts to prove malpractice solely with circumstantial evidence, such evidence must establish that:
more probably than not, [1] the injury was of a kind which ordinarily does not occur in the absence of negligence, [2] that the conduct of the plaintiff or of a third person was sufficiently eliminated by the evidence as a more probable cause of the injury, and [B] that the indicated negligence was within the scope of the defendant’s duty to the plaintiff.
| ^Cangelosi 564 So.2d at 665. The Appellants argue that different doctors noted in Mr. Richard’s medical charts the possibility that the Codman pump malfunctioned. They further argue that Mr. Richard did not introduce the Codman pump into evidence; thus, the possibility of a malfunction of the Codman pump could not be ruled out as the true cause of Mr. Richard’s overdose.
Mr. Richard argues that it is undisputed that he was overdosed by Dr. Indura during the Codman pump refill procedure. He argues that an overdose of a patient with deadly narcotics is an obvious breach of the standard of care. Additionally, an overdose is not supposed to occur during this procedure, according to the testimony of Dr. Domangue, the treating neurologist of Mr. Richard. He further argues that the fact that he collapsed shortly after the procedure demonstrates that his near fatal condition was a direct result of the refill and is a prima facie showing of negligence. As Mr. Richard argued in the first assignment of error, Dr. Indura has not established that the Codman pump was defective. He further argues that if the Codman pump was defective, Dr. Indura failed to notify the United States Food and Drug Administration, or anyone else of the defect.
We find that the Appellants are correct in their argument that the Supreme Court has held that a plaintiff relying on circumstantial evidence alone must meet the three-prong test established by the Supreme Court in Cangelosi We further note that the Supreme Court further reasoned that plaintiffs do not “have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt.” Cangelosi, 564 So.2d at 664 (citations omitted).
In the instant matter, there is no direct proof of negligence on the part of Dr. Indura. With regard to meeting his burden of proof under Cangelosi Mr. Richard | ^established through the testimony of his experts and treating physician, Dr. Domangue, that his overdose was caused by the error of Dr. Indura and was unrelated to a pump malfunction. Mr. Richard further proved that his Codman pump had recently passed a dye test prior to the Codman pump being refilled by Dr. *738 Indura, as previously mentioned; thus, the district court had a sufficient basis in the record for eliminating the conduct of a third person as having been a factor in the overdose of Mr. Richard. Regardless, Mr. Richard is not required to “conclusively exclude” the possibility of a pump malfunction as a possible explanation for his injuries, under Cangelosi Furthermore, while some doctors may have charted a Codman pump malfunction possibly occurred, none of those doctors had firsthand knowledge of the procedure as there were no witnesses to the refill; thus, the district court had a basis to disregard such notes.
Furthermore, Dr. Parker testified that considering the manner in which Dr. Indu-ra performed the refill procedure, Dr. In-dura breached both the standard of care of a board certified anesthesiologist, and the standard of care of a physician who is board certified in pain medicine.
Based upon the record, we agree with Mr. Richard that the overdose itself evidences a breach of the standard of care owed to Mr. Richard where no showing of a pump malfunction has been made. Therefore, the district court did not err in determining that Mr. Richard carried his burden of proof under Cangelosi, and the more probable than not standard. Based upon the record, Mr. Richard did establish by circumstantial evidence that his overdose was caused by the negligence of Dr. Indura.
The third assignment of error raised by the Appellants is that the district court clearly erred in finding that physician error was the most likely cause of the | i;iMr. Richard’s injuries where the overwhelming weight of the evidence indicated that the most likely cause of the plaintiffs overdose was a malfunction of the Codman pump. The Appellants’ two (2) main arguments in support of this assignment of error are that: 1) the overwhelming weight of the evidence indicated that a pump malfunction was the most likely cause of the Mr. Richard’s overdose, and 2) many of the Court’s stated reasons for finding negligence on Dr. Induru’s part are clearly wrong in light of the trial record. However, we note that the crux of the Appellants argument in this assignment of error is repetitive of the previous assignments of error: that the Codman pump was defective.
In their first argument under this assignment of error, the Appellants assert that the overwhelming weight of the evidence indicated that the Codman pump malfunction was the most likely cause of Mr. Richard’s overdose. They argue that Mr. Richard did not prove that it was more likely than not that his injury resulted from some sort of “operator error” by Dr. Indura. Despite offering several theories to explain how Dr. Indura could have caused his overdose, the evidence indicated that the most likely explanation was that Mr. Richard’s overdose was caused by a malfunction of his Codman pump.
The Appellants argue there were four (4) different theories of liability presented at trial:
1. The “wrong needle” theory raised by Mr. Richard is that Dr. Indura mistakenly used a Bolus needle to refill the Codman pump instead of the refill needle included in the pre-packaged Cod-man refill kit. The Appellants argue, however, that a Bolus needle is not included in the kit, and in order for Dr. Indura to obtain a Bolus needle, he would have had to place a special order such a needle from the EJGH central supply department, which he did not do.
|uThe Appellants further argue that Mr. Richard presented no evidence that such oversights occurred, no evidence that Dr. Indura ordered a Bolus needle, nor *739 was there proof that a Bolus needle was recovered from the hospital in connection with this overdose.
Dr. Turnipseed testified that the there was a low probability that Dr. Indura had mistakenly used a Bolus needle instead of a refill needle. He further testified that it was not likely for a physician with the qualifications and experience of Dr. Indura to commit such an elaborate string of errors. The Appellants argued that, according to the testimony of Dr. Turnipseed, the only way that Dr. Indura was able to inject 18 ml of medication into the Codman pump and later aspirate the same amount was because he indeed used a refill needle. Aspiration with a Bolus needle would have resulted in drawing 120-150 ml of cerebrospinal fluid directly from the spinal column.
2. The Missed Pump Theory is that Dr. Indura injected the medication with the correct needle, but injected the medication into Mr. Richard’s skin instead of into the Codman pump. Dr. Turnipseed testified that there was a low probability that Dr. Indura injected the medication into Mr. Richard’s skin or subcutaneous tissue.
3. The next theory that the Appellants argue Mr. Richard raised is that Dr. Indura could have caused the overdose by using the refill needle as a Bolus needle. This would mean that Dr. Indu-ra did not inject the refill needle deep enough into the Codman pump resulting in Dr. Indura filling the bolus port of the Codman pump instead of the reservoir where the medication should have been deposited. Dr. Indura explained that the Codman pump contains a safety valve, if properly functioning, that prevents medicine from travelling through the bolus port unless a Bolus needle is being used for the refill.
4.The last theory introduced at trial by Dr. Turnipseed, but not Mr. Richard, is that a patient can suffer an overdose of medication as a result of the overuse of Codman pump by a physician. The overuse of the Codman pump could cause the silicone septum of the pain pump to deteriorate, which could result in some medication back-flowing into the bolus port as the pump is being refilled. However, Dr. Turnipseed testified that there was a low probability that this was how Mr. Richard’s overdose was caused because Mr. Richard | ^suffered the effects of the overdose too quickly after the refill, which would not have occurred if the septum were worn down.
The Appellants, thus, argue that the most plausible explanation of how Mr. Richard’s overdose occurred is that the Codman pump malfunctioned. Dr. Indura testified that he did not use a Bolus needle for the refill. He further testified that he conducted a routine saline flush of the Codman pump of Mr. Richard just before he refilled the Codman pump which entailed injecting 5 ml of saline and aspirating the same amount. He testified that he would not have been able to aspirate the 5 ml of saline if he were using a Bolus needle.
Dr. Indura testified that in addition to himself, other physicians, as mentioned above, noted their conclusion that Mr. Richard’s overdose was caused by a malfunction of the Codman pump as a result of excluding all other possible causes of the overdose, which Dr. Indura testified is a diagnosis of exclusion. Dr. Turnipseed agreed with Dr. Induru’s diagnosis of exclusion, and agreed that a pump malfunction was the probable cause of Mr. Richard’s injuries. The Appellants also argue that because Mr. Richard could not produce the Codman pump that was implanted in him at the time of the overdose, the *740 possibility of a malfunction cannot be overlooked.
The Appellants second argument under this assignment of error is that the district court’s fact findings are erroneous because many of the court’s stated reasons for finding negligence on the part of Dr. Indu-ra are clearly wrong in light of the trial record. They argue that the district court ignored the fact that Mr. Richard’s medical records contain four separate documents wherein Dr. Indura charted that a “malfunction” of the Codman pump occurred, and that four (4) other physicians also noted this possibility: Dr. Donald S. Adams, Dr. Paul Hubbell, Dr. 1ir,Ulrich A. Starke, and Dr. Hamid Salam. The district court nevertheless held that “[a]t no point after the plaintiff lost consciousness did the defendant chart in the plaintiffs medical records that he experienced a pump malfunction.” Thus, the Appellants argue that there is no basis for the district court’s statement that “[a]t no point after the plaintiff lost consciousness did the defendant chart in the plaintiffs medical records that he experienced a pump malfunction.”
The Appellants argue that Dr. Induru’s testimony lucidly explained how he was able to aspirate 18 ml of the morphine/ba-clofen/clonidine solution from the pump and Mr. Richard could still overdose so soon after receiving his injection.” Dr. Indura testified that it would take less than .5 ml of Mr. Richard’s medication to cause an overdose. He further testified that even though he injected 18 ml of medication, it was possible that there was actually more than 18 ml of fluid in the Codman pump because it is difficult to aspirate all of the fluid contained in the Codman pump. He testified that when he attempted to empty the Codman pump before beginning the refill, it is possible that some old medication or saline remained in the Codman pump. Therefore, after Dr. Indura injected the 18 ml of new medication, he testified that it is possible that there was actually more than 18 ml of fluid in the Codman pump. Dr. Indura further testified that a Codman pump malfunction must have caused a small amount of medication to enter Mr. Richard’s spinal column, but that there must have been at least 18 ml of fluid still left behind in the Codman pump, representing the amount of fluid Dr. Indura was able to later aspirate.
Nevertheless, the district court wrote in its reasons for judgment that Dr. Indura’s testimony “falls short of satisfactorily explaining how the defendant was |17able to aspirate 18 ml of the morphine/baclo-fen/clonidine solution from the pump and the plaintiff overdose on the same only moments after receiving his injection.”
The Appellants further argue that they offered a sealed Codman pump refill kit into evidence to provide definitive proof that the kit excludes a Bolus needle; however, the district court found that the Appellants failed to definitively establish that the Codman refill kit does not contain a Bolus needle. The refill kit entered into evidence was identical to the kit used on the date of Mr. Richard’s overdose and, thus, it speaks for itself. The district court’s finding that defendants failed to definitively establish that the kit excludes a Bolus needle is clearly wrong.
The Appellants, as stated previously, further argue that Dr. Hubbell acknowledged that Mr. Richard’s injuries could have been caused by a malfunction of the Codman pump. However, the district court stated in its reasons for judgment that “Dr. Hubbell testified that had the refill been properly performed plaintiff would not have overdosed.” The Appel-lee’s argue that the district court’s statement implies that Dr. Hubbell ruled out the possibility that Mr. Richard’s Codman *741 pump malfunctioned when Dr. Hubbell explicitly acknowledged the possibility that the overdose could have occurred in the absence of physician error in the event of a Codman pump malfunction. Ultimately, Dr. Hubbell testified that he did not know the cause of Mr. Richard’s overdose.
Thus, the Appellants argue that based upon the misstatements of fact included in the reasons for judgment of the district court, we should find that these errors constitute manifest error and warrant reversal.
Mr. Richard argues that there was sufficient evidence to show that physician error was the cause of his overdose. He argues that it is undisputed that the overdose occurred as a result of Dr. Induru’s injection of 18 ml of medication into | ishis Cod-man pump. Mr. Richard further argues that he presented testimony of two physicians, Doctors Parker and Hubbell, that Dr. Induru incorrectly performed the refill procedure. Lastly, Mr. Richard argues that the Appellants failed to prove that third party error occurred as was their burden.
We find that the district court, as previously noted, was presented with conflicting testimony as to whether the Codman pump malfunctioned. A dye test showed the Codman pump was working properly, and even Dr. Induru testified that he performed a saline test on the Codman pump, which further indicated that the pump was not defective. Furthermore, the district court heard more testimony from various physicians that more probably than not it was physician error that caused the injuries of Mr. Richard'. The district court further noted in its reasons for judgment that it did not find the testimony of Dr. Induru credible.
Where the factual findings are based upon determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact’s findings. Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315, 818 (La.App. 4 Cir. 1993) writ denied, 629 So.2d 414 (La.1993). Only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Id. Therefore, in the matter sub judice, the district court made a credibility determination based on the testimony presented, and further had a basis in the record to find that Mr. Richard’s overdose and resulting injuries were caused by Dr. Induru. In this matter even the medical review panel could not exclude the possibility that physician error was the cause of Mr. Richard’s injuries. Thus, there has been no showing of error on the part of the district court.
| iflThe fourth assignment of error raised by the Appellants is that the district court erred in its factual finding that Mr. Richard proved by a preponderance of the evidence that his 2006 overdose caused the injuries that he seeks relief for in the instant proceeding and awarding him $350,000 in damages. The Appellants argue that the factual finding of the district court is clearly wrong. The Appellants further argue that even if Dr. Induru did cause the overdose, Mr. Richard did not prove that the overdose caused permanent physical or mental damage or deterioration of his quality of life.
The Appellants argue that Mr. Richard relied on the testimony of Dr. Domangue primarily to establish causation, but the testimony of this sole witness was insufficient to satisfy Mr. Richard’s burden of proof. The Appellants argue that Dr. Domangue testified that he did not perform a complete mental status exam of Mr. Richard, and he further testified that he was unable to quantify the extent of Mr. Richard’s memory loss. The Appellants argue that Dr. Domangue also *742 testified that he wanted Mr. Richard to visit another doctor for a formal memory diagnosis, but Mr. Richard did not present himself for further neuropsychological testing. Dr. Domangue further testified that as a result of reviewing an MRI and EMG of Mr. Richard, Dr. Domangue noted that Mr. Richard sustained significant brain injuries such as thrombosis and atrophy of the brain, prior to the 2006 overdose.
Furthermore, the Appellants’ expert, Dr. Adams, a neurologist, testified that by the time Mr. Richard was discharged from EJGH in February 2006, Mr. Richard had fully recovered from the effects of the overdose. Dr. Adams further testified that in his opinion the overdose did not present a physical basis for permanent brain damage given the types of drugs on which Mr. Richard hadj^overdosed. Additionally, Dr. Adams testified that Mr. Richard’s medical history was varied because Mr. Richard: had suffered from brain injuries in a motorcycle accident in the 1970s; had symptoms from Hepatitis C; had a history of intravenous drug abuse; and was prescribed various oral pain medications.
Dr. Adams further testified that in consideration of Mr. Richard’s condition and medical history, Mr. Richard’s short-term memory loss is not surprising. Dr. Adams opined that because Dr. Domangue had prescribed Elavil to Mr. Richard as a sleeping aid, it was possible that the side effects of Elavil were clouding the cognitive function of Mr. Richard. ■ He further testified that the Morphine and Dilaudid that Mr. Richard was being treated with through the Codman pump also could have affected his cognitive ability.
Dr. Adams further testified that the leg pain experienced by Mr. Richard is also unrelated to the overdose, and further opined that the score of Mr. Richard on a mini-mental status exam administered by Dr. Domangue, which was 28 out of 30, was “very good” considering Mr. Richard’s age and medical history. He further testified that the mental and physical deterioration are due to his age, medical history, and the side effects of the medication he has been taking.
Mr. Richard argues that the district court did not err in awarding him $350,000 in damages for the injuries he has sustained as a result of the Appellants’ malpractice. As a result the overdose, he was in the ICU for eight (8) days during which his blood pressure and pulse dropped significantly; and he suffered from hallucinations, seizures, acute respiratory failure, convulsions, malignant hypothermia, hallucinations, drug withdrawals, acidosis, adverse effect of opiates, hypertension, and hypotension. Thereafter, he was hospitalized twice at St. | ⅞1 Tammany Parish Hospital. In total, the cost of Mr. Richard’s hospitalization from EJGH and St. Tammany Parish Hospital was approximately $99,000.
The quantum assessment of a district court is entitled to great deference on review because it is a determination of fact. Talbert v. Evans, 11-1096, pp. 8-9 (La.App. 4 Cir. 3/7/12), 88 So.3d 673, 679, writ denied, 12-0774 (La.5/18/12), 89 So.3d 1197. Furthermore, where the factual findings are based upon determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact’s findings. Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315, 318 (La.App. 4 Cir.1993) writ denied, 629 So.2d 414 (La.1993). Only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Id. Furthermore, our Court has also held that the testimony of a treating physician should be accorded more weight and probative value than that of a physician who *743 has only seen the injured party for purposes of rendering expert testimony concerning the party’s condition. Id. However, the treating physician’s testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all the medical witnesses. Miller v. Clout, 03-0091, p. 6, n. 3 (La.10/21/03), 857 So.2d 458, 462 (citing Freeman v. Rew, 557 So.2d 748, 751 (La.App. 2 Cir.1990)).
Dr. Domangue, a physician who actually treated Mr. Richard, testified that the rapid drop in Mr. Richard’s blood pressure caused the death of some of Mr. Richard’s brain cells, which resulted in brain damage and an early-onset of dementia. He further testified that the subsequent hospitalizations of Mr. Richard at St. Tammany Parish Hospital were connected to the overdose given their close proximity in time. Additionally, the testimony of Mr. Richard and his daughters [¡^revealed that his quality of life has lessened since the malpractice. His daughters both testified that Mr. Richard is no longer self-sufficient; ambulates with a cane; is withdrawn and has become depressed and frustrated; no longer engages in hobbies and activities that he once enjoyed; and his short and long term memory has worsened. We find that there has not been a showing of manifest error by the district court.

DECREE

For the foregoing reasons, the judgment of the district court finding that Parish Anesthesia Associates, Ltd., and Dr. Jaya-chandra Induru, are liable for medical malpractice is affirmed.
AFFIRMED
DYSART, J., concurs in the result.

. La. R.S. 9:2794(C), entitled Physicians, dentists, optometrists, and chiropractic physicians; malpractice; burden of proof; jury charge; physician witness expert qualification, provides:
In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist, optometrist, or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician’s, dentist's, optometrist's, or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.

. Dr. Parker’s primary practice is pain medicine. Dr. Hubbell is board-certified in an *736 esthesiology, interventional pain management and pain medicine. Dr. Domangue was Mr. Richard’s treating neurologist.