PETTIGREW, J.
In this medical malpractice case, the defendants appeal the trial court's entry of a judgment notwithstanding the jury's verdict (JNOV) and its conditional grant of a motion for a new trial in favor of the plaintiffs. For the following reasons, we reverse the trial court's March 15, 2017 judgment and reinstate the jury's verdict, together with the judgment of December 6, 2016, rendered in accordance with the jury's verdict.
FACTUAL AND PROCEDURAL BACKGROUND
J.C. Myles and Willie L. Myles ("plaintiffs") filed a petition against Hospital Service District No. 1 of Tangipahoa Parish, d/b/a North Oaks Health System ("North Oaks") asserting a survival action[1] on behalf of their deceased mother Mattie Parker Myles.[2] The plaintiffs alleged that the North Oaks nurses (particularly, Marsha Zettler, RN) breached the standard of care in the treatment of their mother, which "negatively impacted Ms. Myles' outcome and resulted in Ms. Myles' respiratory distress and her ultimate demise." According to the plaintiffs' petition, Ms. Myles aspirated on a Plavix pill administered by Nurse Zettler, causing her condition to rapidly deteriorate as she developed, among other things, acute respiratory failure and pneumonia, requiring prolonged mechanical ventilation and a tracheostomy. The plaintiffs further maintained that because North Oaks failed to properly manage, control, and supervise the nurses who were acting in the course and scope of their employment with North Oaks, the negligent acts of the nurses were imputed to North Oaks. After extensive discovery, the case was tried to a jury on November 15-18, 2016. On November 18, 2016, the jury answered "No" to the following jury interrogatory: "Do you find by a preponderance of the evidence that North Oaks *549 or its nurses breached the standard of care in the treatment of Mattie Myles."
The jury was polled, confirming a unanimous verdict, and the verdict was made the judgment of the trial court in a written judgment signed by the trial court on December 6, 2016.
The plaintiffs filed a motion for a JNOV and a motion for a new trial. Following a hearing on January 30, 2017, the trial court granted the motion for JNOV and rendered judgment in favor of the plaintiffs in the amount of $534,338.78, plus judicial interest until paid, and all court costs. The trial court also conditionally granted the motion for new trial in favor of the plaintiffs. The trial court signed a judgment in accordance with these findings on March 15, 2017. North Oaks subsequently filed a motion for new trial, which was denied by the trial court in a judgment signed July 7, 2017.
Because the trial court granted the JNOV and awarded damages above the statutory cap of $100,000.00 for qualified health care providers as provided in La. R.S. 40:1299.42(B)(2), the Louisiana Patient's Compensation Fund, Louisiana Patient's Compensation Fund Oversight Board (collectively, the "Board") became involved in the appeal as a matter of law.[3] North Oaks and the Board filed suspensive appeals of the judgment, assigning error to the trial court's grant of the JNOV, its conditional grant of a new trial, and its damage award.[4]
ANALYSIS
In a medical malpractice action, the plaintiff must prove by a preponderance of the evidence the applicable standard of care, a violation of that standard of care, and a causal connection between the violation of the standard of care and the claimed injuries. Pfiffner v. Correa, 94-0924, p. 8 (La. 10/17/94), 643 So.2d 1228, 1233 ; see also La. R.S. 9:2794(A). Resolution of each of these inquiries are determinations of fact that should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La. 1991) ; Washington v. Waring, 2013-0078, p. 7 (La. App. 1 Cir. 2/18/14), 142 So.3d 40, 45, writ denied, 2014-0515 (La. 4/25/14), 138 So.3d 646 ).
In addition to proving a breach of the standard of care, a plaintiff must also establish with adequate evidence a causal connection between the substandard care and the plaintiff's injuries. Pfiffner, 94-0924 at 2, 643 So.2d at 1230. Louisiana Revised Statute 9:2794(A)(3) requires the plaintiff to prove that, as a "proximate result" of the defendant's failure to exercise the required degree of care, "the plaintiff suffered injuries that would not otherwise have been incurred."
Nurses who perform medical services are subject to the same standards of care and liability as physicians. Johnson v. Morehouse General Hosp., 2010-0387, p. 11 (La. 5/10/11), 63 So.3d 87, 96. A nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case.
*550 Granger v. United Home Health Care, 2013-0910, p. 12 (La. App. 1 Cir. 6/19/14), 145 So.3d 1071, 1081, writ denied, 2014-1665 (La. 10/31/14), 152 So.3d 158. It is well established that a hospital can be liable for the negligence of its employees under the doctrine of respondeat superior. Grimes v. Louisiana Medical Mut. Ins. Co., 2009-0292, p. 5 (La. App. 1 Cir. 9/11/09), 29 So.3d 505, 508, aff'd as amended, 2010-0039 (La. 5/28/10), 36 So.3d 215.
Expert testimony is generally required to establish the applicable standard of care and whether that standard of care was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Pfiffner, 94-0924 at 9, 643 So.2d at 1233-1234. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Adams v. Rhodia, Inc., 2007-2110, p. 10 (La. 5/21/08), 983 So.2d 798, 806. Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Indeed, where the fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Adams, 2007-2110 at 10-11, 983 So.2d at 806-807. Where expert witnesses present differing testimony, it is the responsibility of the trier of fact to determine which evidence is the most credible. Washington, 2013-0078 at 8,142 So.3d at 46.
Judgment Notwithstanding the Verdict
A JNOV is a procedural device authorized by La. Code Civ. P. art. 1811, by which the trial court may modify the jury's findings to correct an erroneous jury verdict. Wood v. Humphries, 2011-2161, p. 4 (La. App. 1 Cir. 10/9/12), 103 So.3d 1105, 1109, writ denied, 2012-2712 (La. 2/22/13), 108 So.3d 769. Article 1811 states, in pertinent part:
A. (1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict. ...
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict....
C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
Article 1811 does not set out the criteria to be used when deciding a motion for JNOV. Wood, 2011-2161 at 5, 103 So.3d at 1110. However, the Louisiana Supreme Court *551 has established the standard to be used in determining whether a JNOV is legally called for, stating:
JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."
Joseph v. Broussard Rice Mill, Inc., 2000-0628, pp. 4-5 (La. 10/30/00), 772 So.2d 94, 99 (citations omitted).
In a case such as this, the trial court must first determine whether the facts and inferences point so strongly and overwhelmingly in favor of the plaintiffs that reasonable jurors could not arrive at a contrary verdict. Stated simply, if reasonable persons could have arrived at the same verdict, given the evidence presented to the jury, then a JNOV is improper. Cavalier v. State, Dept. of Transp. and Development, 2008-0561, p. 14 (La. App. 1 Cir. 9/12/08), 994 So.2d 635, 644.
An appellate court reviewing a trial court's grant of a JNOV employs the same criteria used by the trial court in deciding whether to grant the motion. See Smith v. State, Dept. of Transp. and Development, 2004-1317, p. 13 (La. 3/11/05), 899 So.2d 516, 525. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. Id. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. Id.
Therefore, our initial inquiry is whether the evidence at trial so overwhelmingly supported the plaintiffs on the breach of the standard of care issue that reasonable jurors could not have concluded that the plaintiffs failed to establish that either North Oaks or its nurses breached the standard of care in the treatment of Ms. Myles. If so, then the trial court was correct in granting the JNOV. See Granger, 2013-0910 at 7-8, 145 So.3d at 1077-1078. If, however, reasonable jurors in the exercise of impartial judgment might conclude from the evidence that the plaintiffs failed to establish that either North Oaks or its nurses breached the applicable standard of care in the treatment of Ms. Myles, then the trial court erred in granting the motion, and the jury's verdict should be reinstated. Id., 2013-0910 at 8, 145 So.3d at 1078. Neither the trial court nor this court may substitute its evaluation of the evidence for that of the jury, unless the jury's conclusions totally offend reasonable inferences from the evidence. Gutierrez v. Louisiana Dept. of Transp. and Development, 2011-1774, p. 9 (La. App. 1 Cir. 3/23/12), 92 So.3d 380, 386, writ denied, 2012-1237 (La. 9/21/12), 98 So.3d 343.
*552 We turn now to a review of the evidence to determine whether it "overwhelmingly" supports the plaintiffs' contention that the jury could not have reasonably found that the plaintiffs failed to establish that either North Oaks or its nurses breached the standard of care in the treatment of Ms. Myles.
The crux of the plaintiffs' case at trial was that Nurse Zettler breached the standard of care by failing to follow Dr. Lan Q. Ta's orders and by failing to conduct a dysphagia screen on Ms. Myles before administering anything to Ms. Myles by, mouth. The plaintiffs also argued that Nurse Zettler violated North Oaks' protocols by failing to functionally evaluate Ms. Myles as required by the Adult Admission Summary and by not following the Aspiration Precautions protocol, both of which, upon completion, would have required Nurse Zettler to complete a dysphagia screen on Ms. Myles before administering anything to her by mouth. North Oaks and the Board allege that given the considerable disagreement among the medical experts, a reasonable person could conclude that the plaintiffs had not established, by a preponderance of the evidence, that North Oaks or its nurses breached the standard of care in this case.
Among the exhibits presented as evidence to the jury was a copy of the oaths and findings of the medical review panel who considered this case before the matter proceeded to trial. The three physicians on the panel opined that there was no deviation in the standards of care regarding the treatment provided by Dr. Gayden Robert and Dr. Ta, specifically noting that Dr. Ta's orders for "NPO until nurse assess for swallow," was appropriate. With regard to North Oaks, the panel concluded that there was a material issue of fact bearing on liability for consideration by the court, noting that there was "not enough information as to what was communicated as to the findings of the nursing dysphagia screen performed in the Emergency Department."
According to the record, Ms. Myles was brought into the North Oaks emergency room ("ER") by her granddaughter on December 19, 2012, with right sided weakness. It was noted by North Oaks' staff that Ms. Myles was a poor historian and they were unable to get an accurate medical history at that time. Dr. Robert began a CVA (cerebrovascular accident/stroke ) workup and ordered aspirin to be given. A head CT scan performed in the ER was negative for any bleeding, but Ms. Myles continued with residual weakness on the right side with some facial drooping. One of the ER triage nurses, Chanda Fisher, testified about her interaction with Ms. Myles. Nurse Fisher described Ms. Myles as very thin and frail, weighing about eighty pounds. She noted, however, that Ms. Myles was smiling and talking with the nurses, was oriented "to self and place," and was able to follow commands. Nurse Fisher had an order to give Ms. Myles an aspirin, which, based on Ms. Myles' condition, Nurse Fisher expected she would be able to swallow. Nurse Fisher noted that although Ms. Myles had some difficulty swallowing the aspirin and coughed a little, she did, in fact, swallow the aspirin.
At some point thereafter, Dr. Robert verbally ordered the ER nurses to complete a dysphagia screen. Nurse Tiffany Pizzitola, another member of the ER triage team who cared for Ms. Myles, testified at length about her involvement in this case. Nurse Pizzitola explained that a dysphagia screen is "basically a swallow study," and described it as a step-by-step list of questions that nurses go through to determine, among other things, if a patient is able to swallow, cough, and maintain *553 head control. Nurse Pizzitola completed the dysphagia screen on Ms. Myles at 10:15 a.m., and based on Nurse Pizzitola's observations, she believed a speech therapy consult was in order. Nurse Pizzitola acknowledged that although she was familiar with the dysphagia screen, she had only worked in the ER and was not familiar with how things were done by the floor nurses. When asked about Dr. Ta's orders for the floor nurses, i.e., "NPO until nurse assess for swallow", the following exchange took place:
A I mean, if I had to-I can't speculate what his assumptions were on the floor, or what he might have verbally told them on the floor to do. I've never worked up there, so I don't know what their swallow study is.
....
Q When a doctor gives-a doctor at North Oaks in your department gives an order-in the emergency department gives an order to assess for swallow, what does that mean to you?
A To do a swallow study.
Q To do the swallow study. Does it mean to give the patient a pill?
A No.
Q Does it mean to give the patient anything by mouth until the patient passes the first seven items on the checklist?
A Well, I mean, I can't assume that he wanted a secondary dysphagia screen. I mean, I only know what I do in the ER. I can't speculate what they do on the floor.
After spending some time in the emergency department on boarder status,[5] Ms. Myles was transferred to the care of Nurse Zettier in the "surgical ICU as stepdown overflow." When Ms. Myles was transferred to her care, Nurse Zettier was aware that Ms. Myles had failed the dysphagia screen and that she had difficulty swallowing an aspirin earlier in the day. Ms. Myles was "oriented to herself and possibly time."
With regard to Nurse Zettler's December 19, 2012 notes and the doctors' orders concerning the care of Ms. Myles, the following exchange occurred between Nurse Zettier and counsel for the plaintiffs:
Q When you write patient is NPO until speech therapy evaluation, where are you getting that information from?
A Doctor's orders.
Q Which doctor?
A Dr. Ta.
Q You're writing Dr. Ta's order. Patient is NPO until ST evaluation?
A Yes.
Q Then you write, Will do swallow screen-I'm going to stop there.
A Okay.
Q Whose orders are you following when you say, Will do swallow screen?
A Dr. Ta's orders.
Q We're going to continue with that sentence. Will do swallow screen with a Plavix pill in applesauce. Whose orders are you following?
A The Plavix pill was ordered by Dr. [Mussarat.] That order was earlier than Dr. Ta's. Dr. Ta's orders came after his. She was in the emergency room for hours before I got her. When I read *554 those orders, I had an order to assess her swallow, and I did.
Q Did Dr. Ta, who was the latest order; was he not?
A That was the latest order.
Q When-
A Dr. Ta's. [W]hen I took care of her, she-he-yes. He-yes.
Q Dr. Ta's order came after Dr. [Mussarat's] orders?
A Yes.
Q Dr. [Mussarat] had ordered Plavix PO?
A Mm-hmm. (Affirmative)
Q She didn't get any?
A No; she didn't.
Q And then shortly after that Dr. Ta came and examined the patient?
A Mm-hmm. (Affirmative)
Q Yes?
A Yes.
Q And Dr. Ta saidNPO; right?
A Yes; he did.
Q Until there was an assessment for swallow; right?
A Right.
Q Dr. Ta's order?
A Yes.
Q NPO until nurse assess for swallow. Do I read that correctly?
A Yes.
Q And you wrote that down?
A Mm-hmm. (Affirmative) I did.
Q And then it says, If pass can take PO meds; right?
A Yes.
Q Then it says, If the patient cannot take PO, please put an NG tube for meds.
A Right.
Q Continue Plavix and other orders.
A Yes.
Q Where here does Dr. Ta order you to do a swallow assessment for the pill?
A He says nurse to assess for swallow. He doesn't actually say with a pill. What I decided at that point was that we were treating her for CVA. Dr. [Mussarat] had seen her earlier. He wanted her to have a Plavix and that's really important for her to have If we're treating her for a stroke. It's acceptable to use what I used to assess her swallow at that point.
....
Q Did you think there was some emergency need at 7:00 to give her the Plavix pill?
A I did feel that way. That she should have that.
Q Are you allowed to use nursing judgment to contradict a doctor's orders?
A Am I allowed to? I think that at-in this particular case, I made that judgment to do-to have her, give her, that Plavix to see if she could swallow.
Q You gave her the pill to see if she could swallow instead of seeing if she could swallow before she got the pill?
A Well, the pill was crushed in the applesauce.
....
A ... I used the medicine to see if she could swallow with the applesauce.
Q You did it at the same time?
A I did.
Q You did not assess the swallowing first?
A I am not going to-yes; I did assess the swallow at the same time with that pill.
Q Before giving Mattie Myles medicine. Before giving her medicine, did you assess swallow?
A No. I mean, if you put it like that, no.
*555 Q Are you allowed to use nursing judgment to decide that she needs her Plavix even though her doctors had not thought she needed on an emergency basis for nine hours. Are you allowed to use nursing judgment to say, oh, I think she needs it now.
A I used my nursing judgment in this call. Am I allowed to do that? Yes; I think I am.
After admitting that in her prior deposition testimony she indicated that she should have called and clarified Dr. Ta's orders with him, Nurse Zettler was questioned further about Dr. Ta's orders and whether she found the orders confusing.
Q You felt like you did exactly what Dr. Ta asked, or you're not sure what-if you did what Dr. Ta asked? Or, do you feel like Dr. Ta's order is unclear and you don't know?
A I felt like his order was to allow me to assess Ms. Myles for her swallow. And at the time when I got her in the afternoon-late afternoon and she had come from the emergency room, given that she had possibly had a stroke, I assessed her, and I used the Plavix pill. I crushed the Plavix pill, put it in the applesauce in one little teaspoon and gave it to her and she did not pass.
And, on cross examination, Nurse Zettler added that she did not find Dr. Ta's orders confusing in any way.
Nurse Zettler explained that she used a small plastic spoon for the swallow assessment. She crushed the small Plavix pill, which Nurse Zettler described as being round and "a little smaller than an aspirin," into the applesauce and administered the swallow assessment.[6] Nurse Zettler testified that this was consistent with her nursing training and over twenty years of nursing experience. Ms. Myles immediately began choking on the applesauce and pill mixture as she "choked up the applesauce," but Nurse Zettler was uncertain whether she aspirated at that point. Nurse Zettler successfully performed the Heimlich maneuver on Ms. Myles, but her condition deteriorated immediately. Ms. Myles was suctioned and placed on a venting mask. It was not until later that evening when Ms. Myles was hooked up to a ventilator.
With regard to the Adult Admission Summary she completed when Ms. Myles was admitted to the floor, Nurse Zettler acknowledged that she noted Ms. Myles was confused and had swallowing problems and weakness. Nurse Zettler further admitted that she failed to complete the "Functional Screening" section, which would have required a dysphagia screen with a score of 2 or 3 on swallowing status. Nurse Zettler testified that she was familiar with the Aspiration Precautions protocol employed by North Oaks and that if a patient exhibits any of the listed sign/symptoms or risks of aspirations, the nurse is to initiate the dysphagia screen. Nurse Zettler went on, however, to explain her assessment of Ms. Myles upon her arrival to the surgical ICU.
According to Nurse Zettler, Ms. Myles was very thin and frail and appeared to be malnourished. Nurse Zettler indicated that Ms. Myles' speech was a little slurred and she was wispy, but that she was able to communicate and respond appropriately. Ms. Myles was also able to manage her saliva and secretions and was not drooling. Based on her assessment of Ms. Myles and Ms. Myles' alertness and her ability to respond to commands, Nurse Zettler believed that Ms. Myles would be able to swallow.
*556 Nurse Zettler was asked specifically about the dysphagia screen and whether it was a tool that was utilized by the nurses on the floor, to which she responded that it was used in the ER. When pressed about why she failed to follow the steps of the dysphagia screen before giving Ms. Myles anything by mouth, Nurse Zettler explained as follows:
I-I had to assess her. I did. Because of the doctor's orders. And I felt I was following these doctor's orders and then I assessed her to see if she could swallow something. She was-I wasn't going to put an NG tube down her if I didn't have to. I think that she was going to pass this test. Hours later after she came into the emergency room.
Nurse Zettler added that she was never disciplined or reprimanded for her treatment and care of Ms. Myles on December 19, 2012.
The plaintiffs also presented the testimony of Deborah St. Germain, a registered nurse and assistant professor of nursing who was accepted as an expert in the field of nursing. In Nurse St. Germain's opinion, a nurse should follow a doctor's orders as long as it does not put the patient at risk. She stated that if a doctor's orders say "NPO" and a nurse gives the patient something by mouth, this would be a breach of the standard of care. When asked about the use of applesauce to do a dysphagia screen, Nurse St. Germain indicated that applesauce could be used as long as it was used at the appropriate time. She had no opinion on whether the crushed-up pill in the applesauce had any bearing on the outcome in this case.
Nurse St. Germain agreed that because Ms. Myles was already NPO when Dr. Ta wrote his orders, there was really no need for another dysphagia screen. However, another screen would have provided Dr. Ta with information about whether Ms. Myles was still at risk for aspiration and whether they could feed, hydrate, or medicate her by mouth. Nurse St. Germain agreed that there are ways to assess for swallow other than the dysphagia screen and that everyone who testified in this case would likely have differing opinions as to whether it was acceptable and reasonable to proceed the way Nurse Zettler did. She further acknowledged that based on a nurse's training and experience, the way in which the nurse proceeds for a swallow assessment would be a matter of professional judgment.
Another witness called by the plaintiffs was Dr. Donald S. Gervais, Jr., a neurologist accepted as an expert in neurology with a subspecialty in neurological diseases. Based on his review of Ms. Myles' prior medical records, Dr. Gervais described Ms. Myles as very sick and malnourished, noting that she was dependent upon others for all of her nutritional and functional needs even before she was admitted to North Oaks. Ms. Myles had an abdominal hernia, a history of CORD (chronic obstructive pulmonary disease ), and Guillain-Barre syndrome ("the condition that led to her needing to be in the hospital in the first place"). Dr. Gervais explained that Guillain-Barre was an acute autoimmune inflammatory neuritis that causes muscles weakness that progresses throughout the entire body. Ms. Myles also had a Zenker's diverticulum, which Dr. Gervais described as a "gastroenterologic obstructure" that is typically a congenital issue. Dr. Gervais explained, "It's a-like a protrusion of the esophagus that goes into-up into the esophageal area which can cause gastric contents to come up into the esophagus." And while Dr. Gervais believed it was the choking incident and not any of these underlying conditions that led to Ms. Myles developing aspiration pneumonia, he testified that there were *557 "probably complicating factors which probably led to her weakness as well, which made it even more likely to have an aspiration pneumonia." Dr. Gervais added, "her premorbid condition, her other medical problems predisposed and really ticked her over into a fatal outcome unfortunately for her."
Dr. Gervais testified that it was appropriate for Dr. Ta to rely on the nurses to do a swallow assessment. He agreed that because Ms. Myles was already NPO when Dr. Ta wrote his orders, any subsequent use of the dysphagia screen form to let him know that she needed to be NPO would have been a meaningless act. Dr. Gervais acknowledged that applesauce was an appropriate medium to assess for swallowing, but added that he questioned whether Nurse Zettler should have even proceeded to do the assessment. Dr. Gervais opined that Ms. Myles would have had a better chance of getting off the ventilator had she not had pneumonia. And he agreed that Ms. Myles' choking on the Plavix pill was a substantial contributing factor to the aspiration pneumonia and to the further debilitating of her condition, which ultimately led to her death.
Dr. Ta's expert testimony was presented to the jury by video deposition. Dr. Ta, who is board certified in internal medicine, was an internal medicine hospitalist at North Oaks when Ms. Myles was admitted to North Oaks on December 19, 2012. Dr. Ta was called to assess Ms. Myles in the ER and determine if she needed to be admitted. The suspicion at the time was that Ms. Myles had a stroke, but they did not have any tests to confirm this diagnosis at the time. In the days after Ms. Myles was admitted to North Oaks, the neurologist who was following her case began to suspect that Ms. Myles, in fact, had Guillain-Barre.
Dr. Ta stated that Ms. Myles was a poor historian and was having difficulty remembering things. In fact, neither Ms. Myles nor anyone in her family ever disclosed that Ms. Myles had a Zenker's diverticulum before it was discovered on imaging. Ms. Myles was able to respond to Dr. Ta's questioning and speak such that he could understand her clearly. The decision was made to admit Ms. Myles and "administer aspirinPlavix which is an antiplatelet." When asked about his orders, Dr. Ta testified as follows:
Q Did you write orders along those lines?
A I did....
....
A These are my orders.... [A]dmit the patient to internal medicine, inpatient. Diagnosis: [CVA]. Diet: NPO until nurse assess for swallow. If passed, soft, low sodium diet. And if she passed, she can take PO meds.
Q Okay.
A And at the bottom: If patient cannot take PO, please put an NG tube for meds. Continue Plavix and other orders.
Q ... When did you write these orders?
A 3:30 p.m.
When he wrote his orders, Dr. Ta was aware that Ms. Myles had already had a dysphagia screen done in the ER. Dr. Ta indicated that he wanted the floor nurses to do an independent assessment for swallow, noting that a patient's neurological picture may change over time:
So after five or so hours of her being in the ER waiting for me to come down, and after being assessed by neurology and ER staff and on physical examination she was able to communicate with me; I didn't see any slurring; I didn't see any-so it needed to be assessed again because people, after-over time, I've had people who continue to have *558 dysphagia and some people who actually pass the swallow test and are able to eat and take medications.
With regard to his expectations of the floor nurse concerning his orders, Dr. Ta testified that he "didn't intend anything." He added, "I just wrote down my instructions, and that's how-however the hospital is supposed to do things, the nurse is supposed to do things, that's how ... I didn't intend anything." Dr. Ta was adamant that he was not familiar with what the nurses do or what methods they would employ for a swallow assessment. And he had no opinion on whether applesauce is an appropriate medium for a swallow assessment.
Dr. Katherine St. Amant, board certified in internal medicine and pulmonary diseases, was the first expert witness called to testify on behalf of the defendants. She was first consulted on December 20, 2012, because Ms. Myles was having difficulty with her breathing. Ms. Myles was already intubated at that time, and, by the next day, was on the ventilator and comfortable with acceptable oxygen levels. Dr. St. Amant testified regarding her review of Ms. Myles' CT scan from three weeks prior that revealed a "debris-filled cavity" area. While acknowledging that at the time she was unaware of the term "Zenker's," she knew that this was an abnormal finding and an aspiration concern.
Q Does the debris-filled cavity that was later called a Zenker's diverticulum, does that represent a setup for aspiration into the lungs?
A As I said, I'm not an expert on Zenker's diverticulum, but as a pulmonologist, if there is a pouch very close to the throat that has debris and food and left over material that was swallowed, but did not go down into the stomach, but stayed in this pouch there, then I would have concerns that there is a potential there for possible regurgitation and then aspiration as the potential.
Later, when asked if this "pouch with retained content" made Ms. Myles more prone to have repeated aspiration events, Dr. St. Amant stated:
Yes. I think in my opinion that this would be-would make someone predisposed to potential for aspiration of whatever was in the pouch coming out and going into the throat and then possibly coming back into the lungs from that area. So, I would assume that it would give them the potential for that.
Dr. St. Amant noted that as they began to work with Ms. Myles, it became more obvious that the problem was the Zenker's diverticulum. When asked about the failed attempt at placing a nasal gastric tube in Ms. Myles on December 23, 2012, Dr. St. Amant stated that she was not involved in that procedure but that in retrospect, it makes sense that there would have been difficulty trying to pass the tube from the nose down into the stomach because of the Zenker's diverticulum.[7]
Dr. St. Amant testified that Ms. Myles would have likely required intubation regardless of whether she choked on the applesauce because of her worsening Guillain-Barre, which was making her increasingly weak and compromising her respiratory muscles. And, according to the record, there were documented respiratory issues in Ms. Myles' medical chart dating back to the month prior to her admission to North *559 Oaks. In Dr. St. Amant's opinion, the aspiration pneumonia did not cause the level of weakness shown in Ms. Myles' respiratory muscles or the paralysis in Ms. Myles' hands and feet.
According to Dr. St. Amant, by December 21, 2012, Dr. Mussarat started Ms. Myles on medication for Guillain-Barre and that "became the working diagnosis rather than stroke." Dr. St. Amant was concerned about being able to keep Ms. Myles safe on the ventilator because of the weakness of Ms. Myles' respiratory muscles. Dr. St. Amant noted that "as the days went on, the major reason that [Ms. Myles] was on that ventilator was her Guillain-Barre." By December 26, 2012, Dr. St. Amant was more focused on Ms. Myles' weakness from the Guillain-Barre, and the aspiration pneumonia was becoming less and less of an issue. In fact, by December 31, 2012, the aspiration pneumonia had resolved. Nonetheless, Ms. Myles was still very weak with Guillain-Barre and needed to be on a ventilator. By January 10, 2013, Ms. Myles was in no acute distress, was off the ventilator, and had undergone a tracheotomy.
Dr. St. Amant opined that the aspiration pneumonia had nothing to do with anything that happened with Ms. Myles' health after December 31, 2012. Moreover, she had no reason to believe that Ms. Myles' death resulted from anything related to the aspiration event and being put on a ventilator.
Another expert who testified on behaif of the defense was Dr. Ross Carl Klingsberg, board certified in internal medicine, pulmonary diseases, and critical care medicine. Dr. Klingsberg stated that Ms. Myles had several chronic conditions prior to arriving at North Oaks on December 19, 2012. Ms. Myles had severe CORD, with a very limited ability to exhale. She was borderline with respect to needing supplemental oxygen. Dr. Klingsberg indicated that Ms. Myles' body mass index was "far below well nourished," putting her at risk for decreased immune function and decreased strength. She also suffered from cachexia, or muscle wasting. Dr. Klingsberg noted on Ms. Myles' original chest x-ray that she had "virtually no muscle mass there to drive a breathing response."
Dr. Klingsberg opined that it is reasonable to test a patient's swallowing to avoid putting in a nasal gastric tube, which is very uncomfortable. He found nothing wrong with Dr. Ta's orders concerning the bedside swallow assessment. Dr. Klingsberg added that it was appropriate to use applesauce to assess for swallow and that it was appropriate for Nurse Zettler to give Ms. Myles the Plavix as ordered by the doctors.
When asked why Ms. Myles was intubated, Dr. Klingsberg stated it was because she had hypercapnic respiratory failure. He explained that after the aspiration event, she was simply too weak to breathe. Dr. Klingsberg testified that the aspiration pneumonia occupied a small portion at the base of Ms. Myles' right lower lobe. He stated this was not the amount of lung involvement that would normally require ventilation support. Dr. Klingsberg noted that based on Ms. Myles' clinical course and presentation, "one would predict her to have needed ventilatory support. It was just a matter of time."
In ruling on the JNOV, the trial court stated:
Okay. Let's say I was quite surprised by the jury's verdict. And immediately thought that the jury didn't follow the law as I gave it to them when I heard their verdict. And I find that the jury didn't follow the law as I gave it to them. I find that the plaintiff did prove the defendant's liability with the burden of proof more probable than not. The *560 verdict was clearly and contrary to the way the evidence, just from ... what I sat and listened to for several days and the law I read. And I have reviewed both memos and the law. And I did sit through the trial with the jury. But, under the evidence presented at the trial, I don't find reasonable minds could differ as to the liability finding the defendant liable to the action of the plaintiff. As the defense points out, the law and-the case law as well as ... Article 1811, and the case law surrounding it, great deference is given to the jury in this fact finding role. I've never done this before. I've never overturned, I never granted a JNOV because I always gave great deference to the jury. And in this case in the last several weeks and after receiving the motion for a judgment [notwithstanding] the verdict, I've thought back and I've reviewed notes and things. And again, I was quite surprised. I did feel like the plaintiff proved the defense liability and met the burden of proof. So, I wasn't sure and don't know what they went through. A very intelligent jury. I need to say that. They did take their time, they did review the evidence. I just don't find that they followed the law in the end. Whatever they did, and why they did it, they felt like it was just. And it may have been just. But I don't find that they followed the law as I gave it to them on the burden of proof and on what the plaintiff had to prove as far as liability.
After reviewing the testimony of the medical experts in this case, we disagree with the trial court's finding that no reasonable juror could conclude that the plaintiffs had failed to meet their burden of proof on liability. The jury heard conflicting expert testimony concerning whether Nurse Zettler's actions of conducting the bedside swallow assessment of Ms. Myles before completing a second dysphagia screen constituted a breach of the standard of care in this case. All of the experts agreed, however, that applesauce was an appropriate medium to be used to assess for swallow. Moreover, the experts acknowledged that Nurse Zettler faced a judgment call, which required Nurse Zettler to use her training, skill, education, and experience in implementing Dr. Ta's orders. Based on the disagreement among the medical experts in this case, and given that neither the trial court nor this court may substitute its evaluation of the evidence for that of the jury unless the jury's conclusions totally offend reasonable inferences from the evidence, a reasonable person could conclude that the plaintiffs had not met their burden of proof on liability by a preponderance of the evidence presented at trial. See Pitts v. Louisiana Medical Mutual Insurance Company, 2016-1232, p. 8 (La. 3/15/17), 218 So.3d 58, 65 ("Considering the rigorous standard for a JNOV and that the district court was not allowed to evaluate the credibility of the witnesses, after review of the record we find no error in the court of appeal's ruling setting aside the JNOV.") Therefore, we conclude that the trial court's granting of the motion for a JNOV constituted legal error and must be reversed. See Wood, 2011-2161 at 13-14, 103 So.3d at 1116.
Motion for New Trial
Under Article 1811(C)(1), if the trial court grants a JNOV, it must also rule on whether a new trial should be granted in the event the appellate court vacates or reverses the JNOV. The trial court must also specify the grounds for the grant or denial of the motion for a new trial.
Louisiana Code of Civil Procedure article 1972 provides the peremptory grounds for a new trial: (1) when the verdict or judgment appears clearly contrary to the law and evidence; (2) when important evidence *561 is obtained after trial; or (3) when the jury was either bribed or behaved improperly. Pursuant to La. Code Civ. P. art. 1973, the trial court is given discretionary authority to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law."
The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. See Magee v. Pittman, 98-1164, p. 19 (La. App. 1 Cir. 5/12/00), 761 So.2d 731, 746, writs denied. 2000-1694, 20001684 (La. 9/22/00), 768 So.2d 31, 602. The breadth of the trial court's discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 2005-1704, p. 11 (La. 5/30/06), 931 So.2d 338, 344. When the trial court grants a new trial based on Article 1972's mandatory ground of a jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. Martin v. Heritage Manor South, 2000-1023, p. 15 (La. 4/3/01), 784 So.2d 627, 637.
In Pitts, the Louisiana Supreme Court provided the following guidance for considering a motion for new trial in a case such as this:
This court has explained that a motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Unlike the standard applicable to a JNOV, in considering whether to grant a new trial under La. C.C.P. art. 1972(1), a trial judge may evaluate the evidence without favoring either party, and draw its own inferences and conclusions. Most significantly, the district court has authority to evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. However, because a motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations, the jury's verdict cannot be set aside on that ground if it is supportable by any fair interpretation of the evidence. [Emphasis added.]
Pitts, 2016-1232 at 9-10, 218 So.3d at 65-66 (citations omitted).
With regard to the motion for new trial herein, the trial court stated as follows:
Now since this [is] the first time I've ever done this, I know the rule is now that I'm conditionally denying a motion for a new trial according [to] the law. I need to conditionally deny that since I granted the JNOV.... So, again I'm conditionally denying the motion for new trial filed by the plaintiff. And I'm granting the JNOV filed by the plaintiff, but reserving a ruling on any-as to liability. And I'm going to reserve any ruling on damages until I can get memos from you.[8]
Without articulating a specific reason for granting a new trial, the trial court conditionally granted the new trial in favor of the plaintiffs. In its reasons for judgment, the trial court found that the jury did not follow the law on the burden of proof as it *562 was given to them and that the verdict was contrary to the law and to the evidence presented. If that were the case, Article 1972 would mandate the granting of a new trial.
In the instant case, however, we have concluded that based on the considerable disagreement among the medical experts, a reasonable juror could find that the plaintiffs had not met their burden of proof on liability by a preponderance of the evidence presented at trial. The law is well settled that when a JNOV is reversed based on the appellate court's determination that the jury's verdict was reasonably supported by the evidence presented at trial, the alternative request for a new trial should also be denied or reversed on appeal. See Trunk v. Medical Center of Louisiana at New Orleans, 2004-0181, p. 11 (La. 10/19/04), 885 So.2d 534, 540 ("Because we have previously concluded [in reversing the JNOV] that the jury's verdict was reasonable in light of the evidence presented, we find that plaintiff is not entitled to a new trial."); Davis v. Witt, 2002-3102, p. 23 (La. 7/2/03), 851 So.2d 1119, 1134 ("When any fair interpretation of the evidence supports the jury's verdict, the grant of a new trial must be reversed."); VaSalle v. Wal-Mart Stores Inc., 2001-0462, p. 18 (La. 11/28/01), 801 So.2d 331, 342 ("Because we have previously concluded [in reversing the JNOV] that the jury's verdict is reasonable in light of the evidence presented, we find that plaintiffs are not entitled to a new trial."); Yohn v. Brandon, 2001-1896, pp. 11-12 (La. App. 1 Cir. 9/27/02), 835 So.2d 580, 587, writ denied, 2002-2592 (La. 12/13/02), 831 So.2d 989 ("As with the supreme court in VaSalle, we have 'concluded that the jury's verdict is reasonable in light of the evidence presented,' and [therefore,] the plaintiff was 'not entitled to a new trial."'); In re Gramercy Plant Explosion at Kaiser, 2004-1151, p. 17 (La. App. 5 Cir. 3/28/06), 927 So.2d 492, 502, writ denied. 2006-1003 (La. 6/14/06), 929 So.2d 1271 ("[W]hen a JNOV is reversed on determination that the jury's verdict was reasonable in light of the evidence presented, the conditional new trial also should be reversed.").
The same reasoning is applicable to the instant case. In reversing the trial court's grant of a JNOV, we determined that the evidence in the record fully supported the jury's verdict that the plaintiffs had failed to prove that North Oaks and its nurses breached the standard of care in the treatment of Ms. Myles. Moreover, we concluded that given the conflicting opinions expressed by the medical experts, the jury's verdict was reasonable and supportable by a fair interpretation of the evidence. Therefore, the plaintiffs were not entitled to a new trial on the basis that the jury's verdict was contrary to the law and the evidence.
Based on our review of the record evidence, we have found no other grounds-peremptory or discretionary-upon which a motion for new trial could have been granted. See La. Code Civ. P. arts. 1972 and 1973. "A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur." Joseph, 2000-0628 at 15, 772 So.2d at 105. Thus, we find the trial court abused its discretion in conditionally granting the plaintiffs' motion for a new trial.
CONCLUSION
For the above and foregoing reasons, we reverse the March 15, 2017 judgment of the trial court, granting a JNOV in favor of the plaintiffs and conditionally granting a new trial. We reinstate the jury's verdict, together with the December 6, 2016 judgment *563 rendered in accordance with the jury's verdict. We assess all costs associated with this appeal to the plaintiffs, J.C. Myles and Willie L. Myles.
REVERSED; JURY'S VERDICT REINSTATED; JUDGMENT OF DECEMBER 6, 2016 REINSTATED.

The plaintiffs' other claims, including their claim for wrongful death, were dismissed by the trial court on October 14, 2016, pursuant to a motion for partial dismissal filed by the plaintiffs.

The other parties originally named as defendants in this suit, Dr. Pervez N. Mussarat, Dr. Lan Q. Ta, and National Union Fire Insurance Company of Pittsburg, PA, were all dismissed on summary judgment prior to the trial of this matter.

Louisiana Revised Statutes 40:1299.41 to 40:1299.49 were redesignated as La. R.S. 40:1231.1 to 40:1231.10 by HCR 84, effective June 2, 2015.

Because we reverse the trial court's March 15, 2017 judgment and reinstate the December 6, 2016 judgment, we do not address the issue of damages as raised by North Oaks and the Board on appeal.

At the time of Ms. Myles' admission to North Oaks, patients would often be cared for in the ER until a room became available on a floor. This is known as "boarder status." During boarder status, the ER nurses periodically check vital signs and continue the care of the patients. The nurses do not, however, carry out orders written by the doctors that are intended for admit, such as the orders written in this instance by Drs. Mussarat and Ta. According to the record, Ms. Myles was on boarder status in the ER from approximately 10:30 a.m. until approximately 4:35 p.m., before she was transferred to a floor.

Nurse Zettler acknowledged that her notes regarding the Plavix pill do not contain the word "crushed" and that she should have been more detailed in her documentation.

The December 23, 2012 operative report from this attempted procedure indicates that Dr. Daniel A. Linarello was unable to intubate because of Ms. Myles' Zenker's diverticulum. He notes, 'The scope easily passed into the Zenker's diverticulum. Again, there was noted to be retained medication within the Zenker's diverticulum.... Multiple attempts, however, were made to try to find the main esophageal opening. These were all unsuccessful."

Although it is clear from the JNOV hearing transcript that the trial court made multiple references to conditionally denying the plaintiffs' motion for new trial, the March 15, 2017 judgment, which is what is before us on appeal, conditionally grants the motion for new trial. State in the Interest of J.C., 2016-0138, p. 6 (La. App. 1 Cir. 6/3/16), 196 So.3d 102, 106.