# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# 2019 CA 0880

**JENNIFER LANDRY, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILDREN, AUSTIN M. LANDRY AND HAYLEA N. LANDRY, SURVIVING SPOUSE AND CHILDREN OF DECEDENT, JAMIE LANDRY**

# VERSUS

# JOHN DOE AND OUR LADY OF THE LAKE REGIONAL MEDICAL CENTER

**Judgment Rendered:** JUN 2 6 2020

\* \* \* \* \* \*

On Appeal from the Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. 636,526

Honorable Richard "Chip" Moore, III, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Janie Languirand Coles<br>Jonathan E. Thomas<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellant,<br>Mitchell J. Hebert, M.D. |
| Scott H. Fruge<br>Baton Rouge, Louisiana | Counsel for Plaintiffs/Appellees,<br>Jennifer Landry, individually and on behalf of her minor children, Austin M. Landry and Haylea N. Landry, surviving spouse and children of decedent, Jamie Landry |

\* \* \* \* \* \*

**BEFORE: WHIPPLE, C.J., GUIDRY AND BURRIS,[1] JJ.**

---

[1] The Honorable William J. Burris, retired, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

*Guidry, Concurs in part and assigns reasons.*

**BURRIS, J.**

In this medical malpractice action, the trial court rendered judgment on March 6, 2019 in favor of the plaintiffs and against the defendant health care provider upon finding the defendant breached the applicable standard of care by failing to reduce the dose of Dilaudid (hydromorphone) administered to the decedent, the plaintiffs' husband and father, and this breach was causally connected to the decedent's death. The defendant appealed and also filed an exception raising the objection of prescription with this court, asserting for the first time that the plaintiffs' medical malpractice claims are prescribed. For the following reasons, the March 6, 2019 judgment is affirmed, and the defendant's exception of prescription is denied.

## FACTS AND PROCEDURAL HISTORY

Prior to his death on May 6, 2013, the decedent, Jamie Landry, had a complex medical history, including type 1 diabetes, hypertension, pancreatitis, and stage 5 renal failure. Jamie presented to Pointe Coupee General Hospital on May 1, 2013 with complaints of abdominal pain. He was diagnosed with acute pancreatitis and was given one milligram of Dilaudid, an opioid, intravenously at 8:43 pm. After the first milligram did not sufficiently alleviate his pain, Jamie was given another one milligram dose of Dilaudid intravenously at 9:23 pm. He had no adverse reaction.

The treating physician at Pointe Coupee General concluded that Jamie's renal function was worsening due to the pancreatitis. Further, although Jamie was not yet on dialysis, the physician was concerned that dialysis would become an issue. After consulting with Dr. Mitchell Hebert (defendant), the nephrologist on duty at Our Lady of the Lake Regional Medical Center ("OLOL"), the decision was made to transfer Jamie to OLOL for a "higher level of care in Baton Rouge." Dr. Hebert accepted Jamie for direct admission into the OLOL nephrology unit on May 1, 2013 at 11:35 pm.

2

Dr. Hebert was aware of the seriousness of Jamie's medical history and present diagnosis. Additionally, prior to Jamie's transfer, the physician at Pointe Coupee General advised Dr. Hebert that Jamie was given one milligram of Dilaudid twice, which did not relieve his pain "much." Therefore, Dr. Hebert believed that Jamie needed a higher dose to achieve efficacy and appropriate pain control. With this in mind, as well as Jamie's medical history and obesity, Dr. Hebert ordered two milligrams of Dilaudid to be given intravenously every four hours as needed.

Jamie received the first two milligrams of Dilaudid at OLOL at 1:42 am on May 2, 2013, over four hours after the last dose was given at Pointe Coupee General. He received three additional two milligram doses of Dilaudid on May 2nd at 8:44 am (seven hours later), at 2:14 pm (over five hours later), and at 9:21 pm (seven hours later).

Dr. Hebert's shift at OLOL ended at 7:00 am on May 2, 2013, and he had no further involvement with Jamie's treatment. Thereafter, Jamie was evaluated by a gastroenterologist who had previously "followed" Jamie for pancreatitis, a gastroenterology nurse practitioner, and Dr. Daniel Marsh, Jamie's primary nephrologist. Dr. Marsh was also Dr. Hebert's partner at Renal Associates of Baton Rouge, LLC. None of these medical providers adjusted the dose of Dilaudid ordered by Dr. Hebert.

Jamie's wife, Jennifer, and the couple's children visited him in the hospital at 4:00 pm on May 2nd. During the course of their visit, Jennifer noted that Jamie was "really drowsy" and was "too tired" to open his eyes. Jamie "really couldn't interact" with his family and wanted to "just lay there and sleep." According to Jennifer, a nurse's aide entered Jamie's room during their visit to take his vital signs. The nurse's aide shook Jamie to wake him from a "sound sleep" and told him to sit up and "take some deep breaths." She measured

Jamie's oxygen level, then left his room. Sometime later, Jamie's family returned home to Livonia.

Jennifer spoke to Jamie over the phone at 8:00 pm on May 2nd. He remembered their visit earlier that day but did not recall certain events, like the nurse's aide telling him to take breaths or his daughter asking him to open his eyes as he was falling asleep. Jennifer told Jamie, "something is going on; you must be on too much pain medicine or your oxygen must be going down." She told Jamie to tell the nurse "what's going on." There is no indication that Jamie contacted the nurse at this time.

Jennifer called Jamie's hospital room two hours later, around 10:00 pm, as well as his cell phone. But, Jamie did not answer. Jennifer then called the nurse's station and asked the nurse to check on Jamie. Jennifer explained that she was Jamie's wife and was concerned about her husband. She told the nurse that Jamie was unable to remember some things that happened during their visit and expressed concern that Jamie was "on too much pain medicine" and was "lacking oxygen." Jennifer asked the nurse to call the doctor and to see what she, the nurse, could do. The nurse assured Jennifer that she had just checked on Jamie and that he was sleeping and "breathing fine." The nurse told Jennifer that she would call the doctor in the morning.

There are inconsistencies in the nurse's notes concerning the timing of the following events, but the medical records indicate that Jamie was coherent, alert, and oriented, and his chest was rising and falling symmetrically between 10:45 pm and 11:28 pm on May 2, 2013. However, when the nurse returned to Jamie's room at approximately 11:30 pm to change a bag of fluids, he was unresponsive and was not breathing. A code was called. After the medical team's intervention, Jamie regained a viable heart rhythm but remained unresponsive, with suppressed brain waves. He was moved to the intensive care unit, where he suffered another arrest. Jamie died on May 6, 2013.

4

Jennifer requested a medical review panel on June 7, 2013 to determine whether OLOL failed to monitor Jamie. *Jamie B. Landry (D), et al vs. Our Lady of the Lake Regional Medical Center*, PCF File No: 2013-00574. She subsequently amended the request on May 9, 2014 to add Dr. Hebert to the medical review panel proceeding, alleging that he gave an incorrect dose of pain medication and failed to order appropriate monitoring of Jamie, including testing and lab work. The panel, comprised of Dr. Mark Wilson (nephrologist), Dr. Avanelle V. Jack (nephrologist), and Dr. Katherine Eagan May (internist), rendered its opinion in January 2015, unanimously concluding that Dr. Hebert beached the applicable standard of care and that this breach was causally connected to Jamie's death. Dr. Wilson and Dr. May found the dose of Dilaudid was too high, while Dr. Jack concluded that Jamie should have been monitored more closely in the intensive care unit. Two of the three panel members found that OLOL did not breach the applicable standard of care.

Jennifer filed the instant medical malpractice suit in January 2015, individually and on behalf of Jamie and their two minor children, against OLOL and Dr. Hebert. The trial court granted OLOL's motion for summary judgment in September 2015, dismissing it from suit and precluding any allocation of fault against OLOL per La. Code Civ. P. art. 966(G).[2] A bench trial was held on December 10-12, 2018 to determine whether the dose of Dilaudid ordered by Dr. Hebert was a breach of the standard of care practiced by physicians in the field of nephrology and, if so, whether a causal connection existed between this breach and Jamie's death.

---

[2] In September 2015, the trial court also granted the plaintiffs' motion for partial summary judgment against Dr. Hebert, finding him liable for Jamie's death. On December 18, 2015, this court granted Dr. Hebert's writ application and reversed the judgment, finding, on our *de novo* review, that genuine issues of material fact precluded summary judgment. **Jennifer Landry, et al v. John Doe and Our Lady of the Lake Regional Medical Center**, 2015-1464 (La. App. 1st Cir. 12/18/15) (unpublished writ action).

After taking the matter under advisement, the trial court rendered its ruling on January 25, 2019, answering both questions in the affirmative in the plaintiffs' favor and against Dr. Hebert. A judgment memorializing the trial court's ruling was signed on March 6, 2019, awarding the plaintiffs general and special damages totaling $780,680.98.[3] Pursuant to La. R.S. 40:1231, *et seq*, and in light of Dr. Hebert's status as a qualified health care provider, the amount to be paid by Dr. Hebert or on his behalf was reduced to the statutory maximum of $100,000.00, plus accrued judicial interest and costs in the amount of $9,163.57. The remaining amount payable by the Patient's Compensation Fund and the Patient's Compensation Oversight Board on behalf of Dr. Hebert was reduced to the statutory maximum of $400,000.00, plus $57,915.27 for past medical expenses (which the judgment provides is considered future medical care not subject to the malpractice cap under La. R.S. 40:1231.3(B) and La. R.S. 40:1231.2(B)(1)), accrued interest, and costs in the amount of $9,163.57.

Dr. Hebert filed the instant appeal, identifying eleven assignments of error primarily challenging the trial court's acceptance of certain expert testimony, its factual conclusions, and its failure to allocate fault to third parties. Dr. Hebert did not appeal the amount of the damage award. However, before we reach the merits of Dr. Hebert's appeal, we must first dispose of his exception of prescription.

## EXCEPTION OF PRESCRIPTION

After this appeal was lodged, but prior to submission, Dr. Hebert filed an exception with this court raising, for the first time, the objection of prescription.

---

[3] The trial court's written reasons contain a mathematical error in that it states that the total damages awarded were $770,680.98. The judgment correctly reflects, based on the individual award amounts, that the total amount awarded was $780,680.98. When a disparity exists between the judgment and the written reasons for judgment, the final judgment is definitive. **Thibodeaux v. Winn-Dixie of Louisiana, Inc.**, 608 So.2d 673, 677 (La. App. 3rd Cir. 1992) Appellate courts review judgments, not reasons for judgment. **Walton v. State Farm Mutual Auto. Ins. Co.**, 2018-1510 (La. App. 1st Cir. 5/31/19), 277 So.3d 1193, 1199.

La. Code Civ. P. art. 927(A)(1). Louisiana Code of Civil Procedure art. 2163 provides:

> The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
>
> If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.

Dr. Hebert contends that the facts and evidence supporting his exception of prescription appear in the appellate record, and the plaintiffs have not requested a remand. Instead, the plaintiffs ask this court to deny the exception. Therefore, we will consider the merits of Dr. Hebert's exception of prescription.

Since Dr. Hebert does not contend that the plaintiffs' claims are prescribed on the face of the petition, he bears the burden of proving the prescriptive period has elapsed. **Calloway v. Lobrano**, 2016-1170 (La. App. 1st Cir. 4/12/17), 218 So.3d 644, 650. Dr. Hebert points out that his last involvement with Jamie's medical care was on May 1, 2013, and Jennifer testified at trial that she was concerned that Jamie was "on too much pain medicine" and appeared to be "lacking oxygen" on May 2, 2013. Thus, Dr. Hebert contends that Jennifer had knowledge of the malpractice claim against him on or before May 6, 2013, the date of Jamie's death. Dr. Hebert was not named as a defendant in the medical review panel until May 9, 2014, which he argues was days after the expiration of the one-year prescriptive period established by La. R.S. 9:5628.[4]

The prescriptive periods applicable to medical malpractice claims are set forth in La. R.S. 9:5628(A), which pertinently states:

> No action for damages for injury or death against any physician...whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed

---

[4] Dr. Hebert further asserts that, because OLOL was dismissed, prescription was not suspended per La. R.S. 40:1231.8(A)(2)(a), which provides that the filing of a request for a review of a claim shall suspend the running of prescription against all joint and solidary obligors and tortfeasors. The plaintiffs do not challenge this assertion.

within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.

The plaintiffs oppose Dr. Hebert's exception, asserting that they were unaware of Dr. Hebert's involvement as a potential defendant until May 8, 2014, when Dr. Marsh related Jamie's death to the dose of Dilaudid he received at OLOL. During his May 8, 2014 deposition, Dr. Marsh testified, "[M]y impression was that the arrest, in my opinion, developed because of the Dilaudid dose he was receiving." Dr. Marsh explained that the initial arrest rendered Jamie brain dead, which then lead to his death. Dr. Hebert was added as a defendant to the medical review panel proceeding on May 9, 2014, the day after Dr. Marsh's deposition. Jennifer's trial testimony also confirmed that she was initially unaware of Dr. Hebert's involvement.

Dr. Hebert correctly points out that Jennifer testified that she suspected Jamie may have received too much pain medicine and was not getting enough oxygen on May 2, 2013. However, Dr. Hebert failed to point to any evidence to contradict the plaintiffs' assertion that they were not aware that the dose of Dilaudid ordered by Dr. Hebert was excessive and that the dose is what purportedly caused Jamie's injuries and death until May 8, 2014. A plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. **Campo v. Correa**, 2001-2707 (La. 6/21/02), 828 So.2d 502, 511. Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. **Id**. The ultimate issue is the reasonableness of the

8

patient's action or inaction, in light of her education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. **Id**. It is the knowledge of the *cause or reason* for the undesirable result that commences the running of peremption (here, prescription) when such knowledge is not self-evident from the bad result. **Teague v. St. Paul Fire & Marine Ins. Co.**, 2007-1384 (La. 2/1/08), 974 So.2d 1266, 1277 (emphasis added).

In accordance with this jurisprudence, we cannot say that Jennifer's mere suspicion that Jamie may have had too much pain medicine was sufficient to begin the prescriptive period against Dr. Hebert. Instead, prescription did not begin until the plaintiffs had sufficient information that the reason Jamie may have received too much Dilaudid was that the dose ordered by Dr. Hebert may have been excessive. See **Teague**, 974 So.2d at 1277. Further, it was established at trial that the critical care physician on call the night of Jamie's code was uncertain as to what caused Jamie's arrest as of May 3, 2013. Yet, Dr. Hebert asserts that Jennifer, a layperson with no evidence of medical training, had sufficient information on May 2, 2013 to determine the cause of her husband's respiratory failure and eventual death. The jurisprudence does not place such a heavy burden on plaintiffs. See **Campo**, 828 So.2d at 511; **Teague**, 974 So.2d at 1277.

Dr. Hebert failed to refute the plaintiffs' contention that they discovered his alleged act, omission, or negligence on May 8, 2014. Dr. Hebert was added to the medical review proceeding the following day, well within one year from the date of discovery. See La. R.S. 9:5628(A). Therefore, Dr. Hebert's exception raising the objection of prescription is denied.

### ANALYSIS: LIABILITY JUDGMENT

**Applicable Law & Standard of Review**

In a medical malpractice action, the plaintiff must prove by a preponderance of the evidence the applicable standard of care, a violation of

9

that standard of care, and a causal connection between the violation and the claimed injuries. **Myles v. Hospital Service District No. 1 of Tangipahoa Parish**, 2017-1014 (La. App. 1st Cir. 4/6/18), 248 So.3d 545, 549; see also La. R.S. 9:2794(A). Resolution of each of these inquiries is a factual determination that may not be reversed on appeal absent manifest error. **Id.**

Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. **Jackson v. Tulane Medical Center Hospital and Clinic**, 2005-1594 (La. 10/17/06), 942 So.2d 509, 512. To reverse a fact finder's determination, an appellate court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding and further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. **Id.** at 512-3. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. **Id.** at 513.

Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous, particularly where the findings are based on determinations concerning witness credibility and weighing of evidence. Where the fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. **Myles**, 248 So.3d at 550. The trial court's credibility determinations, even when based on depositions offered in lieu of live testimony, are accorded great deference. **Moore v. Smith**, 48,954 (La. App. 2nd Cir. 5/21/14), 141 So.3d 323, 332.

Further, in reaching its conclusions, the trier of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness's testimony and refuse to accept other parts. **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2018-0631 (La. App. 1st Cir. 7/3/19), 281 So.3d 1, 9, writ denied, 2019-01423 (La.

10

11/12/19), 282 So.3d 224. These rules apply equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. **Myles**, 248 So.3d at 550.

In medical malpractice actions, opinions from medical experts are necessary to determine both the applicable standard of care and whether that standard was breached. It is the trier of fact's responsibility to evaluate conflicting expert opinions in relation to all the circumstances of the case and to determine which evidence is most credible. **Lefort v. Venable**, 95-2345 (La. App. 1st Cir. 6/28/96), 676 So.2d 218, 220; **Aymami v. St. Tammany Parish Hospital Service District No. 1**, 2013-1034 (La. App. 1st Cir. 5/7/14), 145 So.3d 439, 447. Where there are contradictory expert opinions concerning compliance with the applicable standard of care, the reviewing court will give great deference to the conclusions of the trier of facts. **Lefort**, 676 So.2d at 221.

## Assignment of Error Nos. 1 and 9

### *Dr. Mark Wilson*

In his first assignment of error, Dr. Hebert asserts that the trial court erred by determining that Dr. Mark Wilson, the nephrologist appointed to the medical review panel *by the defendants*, was qualified to render an opinion at trial as to the issues of standard of care, breach, and causation. When the plaintiffs introduced Dr. Wilson's December 5, 2018 deposition into evidence at trial, Dr. Hebert's counsel expressly stated that she had no objection. During the deposition, which the parties agreed would be admitted at trial in lieu of calling Dr. Wilson to testify, Dr. Hebert accepted Dr. Wilson as an expert in the field of nephrology. Thus, Dr. Hebert waived any objection to Dr. Wilson's qualifications, and the objection will not be considered on appeal. See **Aymami**, 145 So.3d at 455, n. 8, (The depositions of experts were jointly submitted by the parties in lieu of live testimony without any objections. Therefore, any objections to the

11

admissibility of the experts' opinions were waived and cannot be raised on appeal.)

### *Dr. Gary McGarity*

Similarly, in assignment of error no. 9, Dr. Hebert argues that the trial court erred in permitting Gary McGarity, Pharm.D., a clinical pharmacist, to provide expert opinion testimony concerning the standard of care, causation, and Jamie's clinical condition. At trial, Dr. Hebert did not object to the trial court's acceptance of Dr. McGarity as an expert in pharmacy; instead, following voir dire, he objected to the scope of Dr. McGarity's anticipated testimony. Dr. Hebert argued that Dr. McGarity was not qualified to offer an opinion concerning "the clinical aspects" of Jamie's care and the cause of Jamie's arrest.

Dr. McGarity is a retired clinical pharmacist. While earning his pharmacy doctorate, Dr. McGarity studied the application of drug therapy to patient care, meaning, what drugs to use for appropriate diagnosis, what dosages are used, how to use them, and how to monitor for physiologic and mental side effects. During his career, Dr. McGarity practiced as a pharmacist in an outpatient clinic and as a clinical pharmacist for the VA, where he did "a lot of consulting" with physicians concerning opioids and related abuse. He has also consulted with physicians concerning drug interactions and is knowledgeable about how drugs affect the body. Dr. McGarity explained that he does not need to evaluate a patient clinically in a hospital setting in order to know whether a drug was prescribed at an appropriate dose. Instead, he can review a patient's chart to evaluate the patient's organ functions, which tells him if a drug was administered properly.

After questioning by counsel and the court, Dr. McGarity was accepted as an expert in pharmacy, qualified to render an opinion regarding the interactions of drugs vis-à-vis medical conditions, how physicians should prescribe the medication, and the dosage he believes would have been safe. The trial court

also found that Dr. McGarity was qualified to testify concerning whether a reasonable pharmacist would have told a doctor to prescribe the amount of Dilaudid based on the circumstances of Jamie's case and how much Dilaudid Jamie's body would have retained.

On appeal, Dr. Hebert challenges the admission of Dr. McGarity's opinions concerning Jamie's clinical condition prior to and at the time of the code, his interpretation of the nurse's notes, and the cause of Jamie's arrest. He asserts that these issues are outside the scope of Dr. McGarity's knowledge, expertise, and training as a pharmacist. According to Dr. Hebert, Dr. McGarity's opinions cannot help the trier of fact understand the evidence since his opinions are not based on sufficient facts or data.

The trial court has great discretion in determining the qualifications of experts and the effect and weight to be given expert testimony. Trial courts are generally given wide discretion in determining whether a question or subject falls within the scope of an expert witness's field of expertise. The decision to admit or exclude expert testimony is within the sound discretion of the trial court, and its judgment will not be disturbed by an appellate court unless it is clearly erroneous. **Giavotella v. Mitchell**, 2019-0100 (La. App. 1st Cir. 10/24/19), 289 So.3d 1058, 1071. Where a party asserts the trial court erred in permitting evidence, we must consider whether the challenged evidentiary ruling was erroneous and whether the error prejudiced the defendant. If not, reversal is not warranted. The party challenging the trial court's evidentiary ruling bears the burden of proving the error had a substantial effect on the outcome of the case when compared to the record in its totality. **Id.** at 1069.

Dr. McGarity testified that Jamie's medical records show that his oxygen levels were on a downward trend, which he opined was "absolutely" an indicator that Jamie had too much Dilaudid in his system. Dr. McGarity explained that an elevated dose of Dilaudid "adversely affects the brain stem and where a person

13

normally will breathe in and out, it actually stops their respiratory system from working. They stop breathing because of the excess dose." Dr. McGarity also confirmed that Jamie's pain level went from an eight to a zero within eighteen minutes after the last dose of Dilaudid. In his opinion, such a rapid decline in Jamie's pain level indicates the dose was excessive. Dr. McGarity further testified that the risk of respiratory failure associated with Dilaudid is consistent with the nurse's finding that Jamie was not breathing but had a pulse when the code was called, an indication the issue was respiratory, not cardiac.[5] Finally, Dr. McGarity was asked if the Dilaudid brought about the respiratory arrest, to which he responded, "yes."[6]

Contrary to Dr. Hebert's assertion, the challenged opinions offered by Dr. McGarity fall within the purview of his knowledge and experience, particularly concerning how drugs affect the body and how to monitor for drug-related side effects. Furthermore, Dr. McGarity confirmed his ability to determine the appropriateness of a dose of medication by examining a patient's chart to evaluate his organ function. Dr. McGarity relied on this knowledge, skill, and experience to formulate the opinions rendered at trial, and we find no abuse of discretion in the trial court's evidentiary rulings. See La. Code Evid. art. 702.

---

[5] After the answer was provided, Dr. Hebert objected to counsel's question, which the trial court overruled.

[6] Prior to Dr. McGarity's testimony, the trial court ruled that he did not have sufficient information to determine whether Dr. McGarity was qualified to testify as to what caused Jamie's arrest. After Dr. McGarity responded to the question concerning the cause of the arrest, Dr. Hebert objected, arguing that Dr. McGarity failed to provide a basis for his opinion. The trial court sustained the untimely objection. However, when a similar question was posed to Dr. McGarity, then answered, Dr. Hebert failed to object. Louisiana Code of Evidence art. 103 provides, in part, that error may not be predicated upon a ruling which admits evidence unless a timely objection is made. It is well settled that if an objection to a question posed to a witness is not raised at a time when the error in allowing the question can be corrected, the objection is waived. **Briscoe v. Briscoe**, 25,955 (La. App. 2nd Cir. 8/17/94), 641 So.2d 999, 1007. To preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the testimony and state the reasons for the objection. **Stephens v. Town of Jonesboro**, 25,715 (La. App. 2nd Cir. 8/19/94), 642 So.2d 274, 280, writs denied, 94-2351, 2557, 2577 (La. 11/29/94), 646 So.2d 400. For this additional reason, we reject Dr. Hebert's challenge to the admissibility of some of Dr. McGarity's opinions.

14

**Remaining Assignments of Error**

In the nine remaining assignments of error, Dr. Hebert challenges the trial court's factual findings that: Jamie's oxygen saturation levels showed a downward trend, and he suffered opioid-induced respiratory depression, which caused his brain death; that the applicable standard of care required him to reduce the dose of Dilaudid; that he breached the applicable standard of care by failing to reduce the dose; and that a causal connection existed between this breach and Jamie's arrest and subsequent death. Dr. Hebert also asserts that the trial court failed to assign a percentage of fault to the other medical professionals who cared for Jamie after Dr. Hebert, but who did not adjust the dose of Dilaudid. In response, the plaintiffs maintain that the evidence and testimony "clearly shows that the [trial] court committed no reversible error..."

### *Standard of Care & Breach*

The opinions of six medical experts were presented at trial – Dr. Marsh, Dr. Hebert, Dr. Wilson, Dr. Jill Lindberg (nephrologist); Dr. McGarity, and Dr. Dennis Paul (pharmacologist). All agreed that respiratory depression and failure are risks associated with Dilaudid. The drug affects the brain stem, and, as it did here, it may stop a patient's respiratory system from working.

Dr. Marsh and Dr. Hebert testified that the risk of respiratory depression and failure associated with Dilaudid is greater for patients with severe renal failure, like Jamie, because the drug is eliminated more slowly, which may allow it to build-up in the body. If this occurs, the patient may suffer from a gradual decline in brain function, blood pressure, and respiratory rate. Dr. McGarity agreed that Dilaudid may build-up in a patient's body and cause central nervous system depression, marked by sleepiness, then respiratory distress and eventual respiratory failure.

15

The experts explained that respiratory depression, distress, and failure are not synonymous and occur on a gradient. Respiratory depression refers to a slower-than-normal respiratory rate and occurs when "the neurologic stimulus to take a deep breath from the brain is not present." According to Dr. Lindberg, "you're looking for oxygen levels below 90 percent." Respiratory distress follows and occurs when the patient is unable to get adequate oxygen into his system. Finally, the patient is in respiratory failure when he quits breathing.

Contrary to the opinions of Drs. Marsh, Hebert, and McGarity, Dr. Paul and Dr. Lindberg testified that Dilaudid does not gradually build-up in the body. According to Dr. Paul, the effects of an overdose of intravenous Dilaudid occur within ten to twenty minutes from the time it was given. Therefore, he does not believe that Dilaudid contributed to Jamie's respiratory arrest, since the arrest did not occur until hours after the last dose of Dilaudid was given.

The experts generally agreed that the dose of Dilaudid given to patients in renal failure should be adjusted downward, as least initially. Although the literature was not admitted into evidence at trial, substantial testimony was provided concerning the dosing recommendations published by the drug manufacturer, referred to as a "monograph." Dr. Marsh testified that the monograph for Dilaudid provides that patients in renal failure should receive ¼ to ½ of the usual starting dose, depending on the degree of impairment. As to the appropriate standard of care, Dr. Marsh testified that part of the practice of nephrology is knowing the manufacturer's dosage recommendations. All nephrologists should be aware of those guidelines. Similarly, Dr. Hebert acknowledged the importance of knowing how a drug metabolizes in the body and its risks and safety issues.

Dr. Wilson opined that the applicable standard of care requires a nephrologist to "correctly prescribe the correct dosages of medicine" and to follow the patient to determine the effects of the dosages on the patient. He

16

testified that a patient in Jamie's condition should receive 25% of the dose given to a patient with normal renal function. Dr. Wilson explained that the two-milligram dose Jamie received should have been reduced by ¼ to ½ in accordance with the monograph and UpToDate, a medical app used by physicians that provides drug prescribing information. Therefore, according to Dr. Wilson, the appropriate Dilaudid dose for Jamie was .5 milligrams every four hours. Dr. Wilson testified that Dr. Hebert breached the standard of care by prescribing an excessive dose of Dilaudid.

Dr. McGarity agreed that, per the monograph and UpToDate, .5 milligrams was the appropriate dose for Jamie, but he acknowledged that the dose could be increased if it was not controlling Jamie's pain. Dr. McGarity also testified that the recommended dose for a patient who is "opioid naïve" (who is not opioid tolerant) is less than one milligram. In Dr. McGarity's opinion, Jamie was opioid naïve and, thus, should have received a decreased dose for this additional reason. Finally, according to Dr. McGarity, Dr. Hebert should not have considered Jamie's weight as a factor in determining the appropriate dose, because dose is based on lean muscle, not fat.

Dr. Hebert testified that the dose he ordered did not fall below the standard of care for nephrologists and argues on appeal that the trial court committed "reversible error" by finding that the applicable standard of care required him to reduce the Dilaudid dose to ¼ to ½ of the normal dose given to patients with normal renal function. At trial, Dr. Hebert agreed that the starting dose should be reduced for people with kidney disease, but he stressed that he ordered a maintenance dose, not a starting dose, since Jamie received two milligrams of Dilaudid at Pointe Coupee General. Additionally, testimony established that the monograph recommends .2 to one milligram every two to

17

three hours as a starting dose for patients without renal issues, and Dr. Hebert extended Jamie's dose to every four hours.[7]

Dr. Lindberg and Dr. Paul agreed with Dr. Hebert that the dose he ordered was not a starting or initial dose.[8] Notably, though, Dr. Lindberg also testified that the monograph discusses a reduced dose for renal failure patients, generally, and denied that the recommended dose is a starting dose for these patients. In contrast to Dr. Wilson's opinion, Dr. Lindberg testified that Dr. Hebert's assessment and plan were "well within" the standard of care for Jamie's presentation. Dr. Lindberg opined that the dose ordered by Dr. Hebert was appropriate and was not a breach of the standard of care. Finally, Dr. Marsh agreed and testified that he "supported the dose."[9]

Again departing from Dr. McGarity's opinion, Dr. Lindberg and Dr. Paul testified that Jamie was not opioid naïve because he received opioids in September 2012, when he was admitted to OLOL for pancreatitis. These experts also disagreed with Dr. McGarity's opinion concerning Jamie's weight as a dosing factor and testified that Dr. Hebert correctly took this into account to determine the appropriate dose of Dilaudid for Jamie.

Although Dr. Hebert is correct that testimony in the record supports his argument that the dose he ordered for Jamie was an appropriate maintenance

---

[7] Because Dr. Hebert ordered two milligrams every four hours, rather than every three, he argues that the trial court manifestly erred in finding that he failed to reduce the dose of Dilaudid. However, no testimony was presented to establish that this reduction was sufficient. Further, this reduced dose still exceeds the dose Dr. Wilson and Dr. McGarity testified was appropriate for Jamie, .5 milligrams every four hours.

[8] Dr. Hebert also cites to the text of the monograph attached to several pretrial motions; however, as stated, the monograph was not introduced into evidence at trial. Evidence not properly and officially offered and introduced cannot be considered on appeal, even if it is physically placed in the record. **Denoux v. Vessel Management Services., Inc.**, 2007-2143 (La. 5/21/08), 983 So.2d 84, 88.

[9] Dr. Hebert asserts that the trial court erred by "selectively disregarding" portions of Dr. Marsh's testimony and by "materially" misquoting his testimony. These arguments fail. The trial court clearly had the discretion to accept only parts of Dr. Marsh's testimony. See **Pontchartrain Natural Gas System**, 281 So.3d at 9. Although we disagree that the trial court "materially" misquoted Dr. Marsh, to the extent the trial court was incorrect regarding the precise words used by Dr. Marsh, we find this error inconsequential, particularly in light of the testimony, set forth therein, which supports the trial court's findings.

dose, we cannot disregard the great deference afforded to the trial court under the applicable standard of review. The contradictory evidence supports the trial court's conclusion that the dose was too high, regardless of whether it was a maintenance or starting dose, and that the applicable standard of care required that the dose of Dilaudid be reduced by ¼ to ½ of the normal dose for a patient like Jamie, with a diagnosis of end stage renal disease. We cannot say that the trial court's choice to credit the testimony of one witness over another was manifestly erroneous. See **Myles**, 248 So.3d at 550; **Moore**, 141 So.3d at 332.

Finally, on appeal, Dr. Hebert asserts that the trial court's determination that he breached the standard of care was improperly based on hindsight. See **Lefort**, 676 So.2d at 220, (The physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection or evaluated with benefit of hindsight.) According to Dr. Hebert, the dose he ordered for Jamie was appropriate based on the information he had at the time, particularly, Jamie's vital signs remained stable, with no adverse reaction, after he received two milligrams of Dilaudid within forty minutes at Pointe Coupee General, and one milligram was not adequate to address Jamie's pain.

Although Dr. Hebert testified to these facts at trial, he again overlooks the other established facts that support the trial court's decision. Dr. Hebert acknowledged at trial that he was aware of the severity of Jamie's renal failure at the time he ordered the two-milligram dose of Dilaudid. He was also aware that respiratory failure was a significant risk associated with Dilaudid, particularly for patients in renal failure, because it may build-up in these patients and lead to respiratory distress. It was evident from the testimony of Dr. Wilson and Dr. McGarity that these considerations – Jamie's medical condition and the elevated risks of Dilaudid in patients with kidney failure – weighed heavily in their opinions that Dr. Hebert breached the standard of care by ordering an excessive dose of

19

Dilaudid.  Therefore, we do not agree that the trial court's determination was impermissibly based on hindsight.

After reviewing the record in its entirety, it is apparent that the trial court was required to weigh evidence and make credibility determinations.  Nearly all issues relevant to the plaintiffs' burden of proof were supported and opposed by contradicting expert testimony.  The record contains sufficient evidence to support the trial court's conclusion concerning both the applicable standard of care and a breach of that standard by Dr. Hebert.  The trier of fact was required to evaluate conflicting expert opinions to make both determinations. **Lefort**, 676 So.2d at 220-1.  Giving the required deference to the trial court's conclusions, we find no manifest error.

### *Causal Connection*

Dr. Hebert also challenges the trial court's conclusion that his breach of the standard of care had a causal connection to Jamie's death.  He disputes the trial court's factual finding that Jamie's oxygen levels showed a downward trend and that respiratory failure caused his death.  Finally, Dr. Hebert asserts that the trial court improperly applied a presumption of negligence due to the existence of an injury.

It is undisputed that Jamie's oxygen level did not drop below 90% until he arrested and his oxygen level fell to 80%.  However, it is also undisputed that prior to the arrest, Jamie's oxygen level was initially at 96%, then it declined to 93%, then to 92%. Dr. Lindberg acknowledged, "the actual numbers are downward....it's a downward trend..."  In her opinion, the downward trend was not significant and did not present "a worry for danger."  Although Dr. Lindberg was not alarmed by Jamie's oxygen levels, she confirmed that a patient's respiratory rate would decrease if he was having respiratory depression from an opioid.

Dr. McGarity disagreed with Dr. Lindberg's lack of concern and testified that Jamie's oxygen levels "absolutely" indicated that he had too much Dilaudid in his system. His testimony that a patient will be sleepy if given too much Dilaudid coincides with Jennifer's testimony that Jamie was too tired to keep his eyes open during the family's afternoon visit on May 2, 2013. This supports the conclusion that Jamie's central nervous system was depressed due to the excess Dilaudid building up in his system. Furthermore, to the extent Jamie's medical records reflect that he was awake and alert prior to the code, this contrast to Jennifer's testimony presented yet another disputed issue of fact the trial court was required to resolve.

Dr. Marsh similarly confirmed that he would expect Jamie to be lethargic if he was in respiratory depression. He testified that, when he spoke to Jennifer the morning after Jamie's arrest, she explained that she had to call the nurse to wake Jamie because he was not arousing to answer her phone call. Based on this information, Dr. Marsh "assumed that it was because of the fact that he was perhaps over-sedated." Dr. Paul also agreed that a patient would fall asleep before experiencing respiratory depression as a result of central nervous system depression.

It was further established at trial that, during his deposition, Dr. Marsh testified that his impression was that the arrest developed because of the dose of Dilaudid Jamie received. At trial, Dr. Marsh testified that he agreed with the dose ordered by his partner, Dr. Hebert, and would have changed it if he did not. However, he acknowledged that Jamie was in respiratory failure when he arrested and that the dose of Dilaudid given to Jamie was a contributing factor in causing the arrest. Even Dr. Hebert admitted that the nurse's notes indicate that Jamie was in respiratory failure at the time of the arrest.

Finally, although it is undisputed that Jamie was very ill and that pancreatitis has a high mortality rate, particularly for someone with Jamie's

21

medical issues, Dr. Marsh confirmed that the arrest caused Jamie to lose brain function, which eventually lead to his death, not pancreatitis. Dr. Hebert testified that the type of pancreatitis Jamie had may cause sudden death because the heart may abruptly stop beating. But, the experts confirmed that Jamie had heart function when he coded. Like Dr. Marsh, Dr. Wilson testified, "I think in this particular case, you know, my opinion was that an excessive dose of hydromorphone [Dilaudid] was prescribed for the patient's medical condition and that excessive dose led to respiratory failure." Both Dr. Wilson and Dr. McGarity confirmed that what happened to Jamie is consistent with the literature and concerns associated with prescribing an excessive dose of Dilaudid.

As with the standard of care and breach determinations, the trial court was confronted with conflicting testimony concerning whether a causal connection existed between Dr. Hebert's breach of the standard of care and Jamie's injuries. We cannot say the trial court was manifestly erroneous in finding that the plaintiffs satisfied their burden of proving, through medical testimony, that it is more probable than not that Jamie's injuries were caused by Dr. Hebert's substandard care. See **Parker v. Phares**, 2018-1291 (La. App. 1st Cir. 5/28/19), 2019 WL 2265102, *4 (unpublished), writ denied, 2019-01285 (La. 10/21/19), 280 So.3d 1165, (The plaintiff need not show that the health care provider's conduct was the only cause of harm, nor must all other possibilities be negated, but the plaintiff must show by a preponderance of the evidence that he suffered injury because of the health care provider's conduct.) A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. **Holcomb v. Ethicon, Inc.**, 2005-2117 (La. App. 1st Cir. 11/8/06), 2006 WL 3208460, *3 (unpublished), writs denied, 2006-2904, 2911 (La. 1/26/07), 948 So.2d 178, 179.

### Thirty-Party Fault

Finally, we turn to Dr. Hebert's assertion that the trial court erroneously failed to apportion fault to other health care providers who treated Jamie but who did not modify the dose of Dilaudid ordered by Dr. Hebert, specifically a gastroenterologist, a gastroenterology nurse practitioner, and Dr. Marsh. In response, the plaintiffs argue that Dr. Hebert failed to satisfy his burden of proving third-party fault.

Under Louisiana's comparative fault regime, "in any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty." La. Civ. Code art. 2323. Third-party fault is an affirmative defense; as such, the party pleading third-party fault bears the burden of proving it by a preponderance of the evidence. La. Code Civ. P. art. 1005; **Richard v. Parish Anesthesia Associates, Ltd.**, 2012-0513 (La. App. 4th Cir. 12/14/12), 106 So.3d 730, 735, writ denied, 2013-0116 (La. 3/1/13), 108 So.3d 1179. To succeed in allocating fault to a non-party, the defendant must prove that the non-party's conduct was a causative factor of the damages sustained and was a breach of duty to the plaintiff. **Willis v. Noble Drilling (US), Inc.**, 2011-598 (La. App. 5th Cir. 11/13/12), 105 So.3d 828, 842. The trier of fact is owed great deference in its allocation of fault, and the trial court's judgment should be affirmed unless it is manifestly erroneous or clearly wrong. **Blake v. City of Port Allen**, 2014-0528 (La. App. 1st Cir. 11/20/14), 167 So.3d 781, 790.

We find that Dr. Hebert failed to carry his burden of proving third-party fault at trial. Although he asserted the affirmative defense in his answer, Dr. Hebert did not introduce or proffer any evidence at trial to establish third-party fault.[10]

---

[10] No evidence was presented at trial to establish the applicable standard of care for a gastroenterologist or a gastroenterology nurse practitioner. No experts in this field testified at

Instead, his defense at trial focused solely on the argument that he did not breach the standard of care practiced by physicians in the field of nephrology, that his management care was appropriate, and that his conduct was not a causative factor of Jamie's death.[11]

In **Willis**, 105 So.3d at 842, the defendant raised third-party fault as an affirmative defense in its answer but did not introduce evidence at trial to bear the requisite burden of proof regarding any allocation of fault to a non-party. The Fifth Circuit concluded that the trial court committed reversible error by including the non-party on the jury interrogatories. **Id.** As in **Willis**, Dr. Hebert's mere assertion of the affirmative defense of third-party fault was insufficient; thus, the trial court properly refused to apportion fault.

## CONCLUSION

For the foregoing reasons, the March 6, 2019 judgment in favor of the plaintiffs and against Dr. Hebert is affirmed, and Dr. Hebert's exception raising the objection of prescription is denied. Costs of this appeal are assessed against the defendant/appellant, Dr. Mitchell Hebert.

**AFFIRMED. EXCEPTION OF PRESCRIPTION DENIED.**

---

trial, and no evidence was presented concerning what health care professionals in this field knew or should have known concerning the risks of Dilaudid.

[11] For example, this case was initially scheduled to be heard as a jury trial. Before the case was converted to a bench trial, Dr. Hebert submitted proposed jury instructions to the court. Notably, these proposed jury instructions do not mention third-party fault.

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2019 CA 880

JENNIFER LANDRY, INDIVIDUALLY AND ON BEHALF OF HER MINOR
CHILDREN, AUSTIN M. LANDRY AND HAYLEA N. LANDRY,
SURVIVING SPOUSE AND CHILDREN OF DECEDENT, JAMIE LANDRY

VERSUS

JOHN DOE AND OUR LADY OF THE LAKE REGIONAL MEDICAL
CENTER

**GUIDRY, J., concurs in part and assigns reasons.**

**GUIDRY, J., concurring in part.**

I concur with the majority's denial of the defendant's exception of prescription, but write separately to note that we are constrained by the contents of the record on appeal in our efforts to determine whether this action is prescribed as to Dr. Hebert. Appellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence. Denoux v. Vessel Mgmt. Servs., Inc., 07-2143, p. 6 (La. 5/21/08), 983 So. 2d 84, 88.

Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. The period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry, and this notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of

1

prescription. <u>Campo v. Correa</u>, 01-2707, pp. 11-12 (La. 6/21/02), 828 So. 2d 502, 510-11.

In the exception of prescription filed for the first time with this court, Dr. Hebert avers that the prescriptive period against him commenced on May 6, 2013, the date of Mr. Landry's death, and no claims were brought against him until May 9, 2014, which was over a year after Mr. Landry's death. Often in a medical malpractice case, the death of a patient provides a plaintiff with actual knowledge sufficient to begin the running of the prescriptive period. However, as noted by the majority, even if a malpractice victim is aware of an undesirable condition or result, prescription will not run for so long as it was reasonable for the victim not to recognize that the condition might be treatment related. <u>Campo</u>, 01-2707 at 12, 828 So. 2d at 511. The mere apprehension of Mr. Landry's wife that he may have had too much pain medicine did not automatically begin the running of prescription, especially in light of the fact that even the critical care physician on call when Mr. Landry coded on May 2, 2013 was not certain as to what caused Mr. Landry's arrest. <u>Campo</u>, 01-2707 at 12, 828 So. 2d at 511.

Additionally, Mrs. Landry's affidavit, which was included as an exhibit in opposition to OLOL's motion for summary judgment, indicates that, after Mr. Landry's death, she received an invitation from OLOL to discuss her concerns, which invitation she accepted. Mrs. Landry then received correspondence on May 10, 2013 from OLOL stating that the hospital would complete its investigation regarding Mr. Landry's care in approximately ten days and they would provide her with a written response. However, Mrs. Landry did not receive any response from OLOL and, subsequently, filed a request for a medical review panel on June 7, 2013.

2

In the request for a medical review panel, the sole complaint against OLOL was "failure to monitor." At this point, when the request for a medical review panel was filed, Mrs. Landry had constructive knowledge of facts indicating that her husband was the victim of a tort. Mrs. Landry filed the request only against OLOL, which could have been the result of her having no knowledge of Dr. Hebert's involvement in Mr. Landry's treatment as she testified at trial. While Dr. Hebert's involvement in Mr. Landry's care was documented in the medical records from OLOL, it is unclear when those records were requested by, provided to, or reviewed by Mrs. Landry.

In view of the record on appeal, it cannot be determined at which point Mrs. Landry's mere apprehension that something was amiss regarding her husband's medical care crossed the threshold into knowledge, *i.e.*, that she knew or should have known through the exercise of reasonable diligence that Mr. Landry's death was the result of medical malpractice by Dr. Hebert. See Campo, 01-2707 at 12, 828 So. 2d at 511. It could have been after her meeting with OLOL, the date of which is unclear from the record. It could have been when she requested or received all of the medical records from OLOL. The record on appeal is insufficient to establish when, precisely, Mrs. Landry had either knowledge or constructive knowledge of facts indicating that her husband was the victim of medical malpractice by Dr. Hebert.

For these reasons, I respectfully concur in part.

3